HERBERT W. DUSTIN AND KATHLEEN C. DUSTIN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 414–68    Filed December 30, 1969.

*Walter G. Schwartz*, for the petitioners.
*Joel A. Sharon*, for the respondent.

DRENNEN, *Judge:* Respondent determined a deficiency and an addition to tax respectively of $4,286.77 and $383.76 with respect to petitioners' income tax for the year 1961.

The issues for decision are: (1) Whether loans made to a partnership became worthless in the year 1961, thereby entitling petitioners to a bad debt deduction; (2) whether certain legal and accounting fees incurred by a subchapter S corporation in connection with proceedings before the Federal Communications Commission constitute capital expenditures or ordinary and necessary business expenses; and (3) whether the late filing of petitioners' 1961 income tax return was due to reasonable cause or willful neglect.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioners Herbert W. Dustin and Kathleen C. Dustin, husband and wife, resided in Portola Valley, Calif., at the time their petition was filed. They filed their 1961 joint Federal income tax return with the district director, San Francisco, Calif.

Petitioner Herbert W. Dustin (hereinafter referred to as Dustin) is a certified public accountant and a senior partner in the accounting

firm of Prior & McClellan. Dustin has been a member of the accounting profession since 1946.

### Issue 1. Worthless Debt

On November 14, 1958, I. Kurt Leswing and Ellie E. Leswing, husband and wife, formed a partnership [1] with Dustin known as Century Schoolbrook Press (hereinafter referred to as Century and sometimes as the partnership). The principal business of Century was the publishing of textbooks for submission to the State of California for adoption and use in the California school system. Prior to the formation of the partnership, the Leswings had operated a book-publishing business under the name of Century Schoolbook Press in partnership form.

The oral partnership agreement was that Kurt and Ellie Leswing were each to have a 35-percent interest and were to be general partners, while Dustin was to have a 30-percent interest [2] and be a limited partner. In return for their interest in Century, the Leswings contributed the copyright of a book published in 1957, work-in-process (most important of which was a kindergarten music book and a series of three readers), $15,000 of the royalty payments due from the adoption of the book published in 1957, and the use of their home, furniture, and fixtures. For his interest, Dustin contributed $30,000 cash.

The day-to-day operations of the partnership were run by the Leswings, Ellie Leswing being in charge of the creative aspect of the operations and Kurt Leswing being in charge of the business end of the operations. Due to the nature of the business, the time Ellie Leswing spent on the partnership business varied depending on the situation. During 1961 and 1962, however, she worked full time. Kurt Leswing, on the other hand, was a printing press salesman and worked only part time for the partnership from its creation until sometime in 1963 when he began giving the partnership his attention on a full-time basis. Dustin did not take an active part in the operations of Century, but was kept generally advised of any important decisions which had to be made.

The books of the partnership were kept on the cash basis method of accounting and were kept under Dustin's general supervision. Dustin

---

[1] The parties stipulated that a limited partnership was formed in 1958; however, the partnership agreement does not appear to have been reduced to writing until July 16, 1964. See Cal. Corp. Code sec. 15502 (West 1955).

[2] The Leswings did not want more than one partner, but they agreed that Dustin could assign part of his partnership interest. The record shows that Blanche Wallace, the bookkeeper of Century, held one-sixth of Dustin's interest, or a 5-percent partnership interest. Her interest was not recorded on the books of Century, but she reported one-sixth of Dustin's distributive share of the partnership income on her income tax returns.

prepared the partnership's returns (Form 1065) for the years 1958 through 1963.

In order that the publishing companies were aware of the type of textbooks needed by the California school system, the California Board of Education issued from time to time a "call for bids." This notified the publishers of not only the type of textbooks needed, but also the deadline for the submission of books.

Textbooks submitted for adoption were categorized as either basic textbooks or as supplemental textbooks. A basic textbook is one which is supplied throughout a grade level on the basis of one textbook per student. A supplemental textbook is supplemental material to the basic textbook and is generally supplied on the basis of one textbook for two or more students. A supplemental adoption is therefore much smaller than a basic adoption and consequently reaps smaller profits. The national publishing companies ordinarily do not engage in the supplemental textbook field; hence, the competition is less in the supplemental textbook field.

In responding to a call for bids Century would print approximately 500 copies of the book to be presented for adoption. These books would then be given to the California Department of Education which would distribute them to principals, supervisors, and teachers for their review and comment. A written report of their findings would be submitted to the State Curriculum Commission, the body responsible for recommending to the board of education which books should be adopted for use in the California school system. After reviewing these reports, the Curriculum Commission would make a preliminary elimination of books in each subject. A decision was thereafter made, presumably by majority vote, as to which of the remaining books would be recommended for adoption to the board of education. The board of education makes the final decision on which books will be adopted.

An adoption is generally for a period ranging from 4 to 8 years. Instead of purchasing the textbooks directly from the publisher, California purchases the plates of the adopted book and prints and distributes the books itself.

Between the date of its formation and the end of 1961, Century submitted six books to the California Board of Education for adoption. Four of these books were submitted prior to 1961 and were all rejected by the board of education prior to 1961. In 1961 in response to a call for bids dated November 1, 1960, Century resubmitted two of the books which had been submitted earlier and rejected and in addition submitted two new books. The two new books (hereinafter referred to as the Canadian series and the civic series) actually consisted of four individual titles.

Dustin and the Leswings had particularly high hopes for the Canadian series being adopted since it was the only book submitted in response to the call for bids for that particular subject. Century was notified, however, in November 1961 that the Curriculum Commission had not only rejected the Canadian series, but also all of the books Century had submitted. In January 1962 the board of education adopted the books recommended by the Curriculum Commission.

Another source of income for the publishing companies in California is the sale of textbooks directly to the local school boards. Each school board has limited funds with which it can purchase textbooks directly from a publisher. In an attempt to tap this market, Century in 1959 and 1961 printed 10,000 copies of the books which were to be submitted for adoption in those years. For the years 1959, 1960, and 1961, this was Century's only source of income. The income received from this source, however, was less than the cost of the books. Century, therefore, sustained a loss in each of the years 1958 through 1961. A summary of the profit-and-loss statements of Century, as reflected on its income tax returns, for the years 1958 through 1961 is as follows:

| | Taxable year ended Dec. 31— | | | |
|---|---|---|---|---|
| | 1958 | 1959 [1] | 1960 [2] | 1961 |
| Sales | $403.77 | $2,946.02 | $7,759.23 | $8,920.70 |
| Cost of goods sold | 687.40 | 29,044.73 | 13,428.92 | 12,164.13 |
| Gross profit (loss) | (283.63) | (26,098.71) | (5,669.69) | (3,243.43) |
| Deductions | 1,713.33 | 8,409.28 | 10,742.81 | 21,909.90 |
| Net profit (loss) | (1,996.96) | (34,507.99) | (16,412.50) | (25,153.33) |

[1] The figures for 1959 represent the results for the period after the formation of Century in 1958. Figures appearing in the return for a prior period, representing income in which Dustin did not share, were excluded.
[2] The tax return for 1960 could not be located. The figures were prepared by Dustin from his working papers for Century for 1960.

On July 10, 1961, Dustin and Kurt Leswing entered into a written agreement whereby they agreed to engage in the trading of securities with any profits therefrom to go to Century for use as working capital. The agreements reads as follows:

### MEMORANDUM OF UNDERSTANDING

In order to further the interests of Century Schoolbook Press partners Kurt Leswing and Herbert W. Dustin have undertaken the trading of securities with the understanding as follows:

All net profits from trading will go to Century for use as working capital.

The net profits from trading will accrue half and half to Kurt Leswing and Herbert W. Duston.

It is hereby agreed by all partners that the above arrangement is fair and equitable, and is hereby accepted by all partners.

All three partners signed the agreement.

Pursuant to that agreement Dustin and Kurt Leswing traded in securities during 1960, 1961, and 1962 with the following results:

1960_____ Gain  $2, 764. 17
1961_____ Gain  13, 600. 79
1962_____ Loss  (5, 912. 15)

Dustin reported his one-half of the 1961 gain on his 1961 income tax return as $6,800.39 and his one-half of the 1962 loss on his 1962 income tax return as ($2,956.07).

The gains in 1960 and 1961 were treated as loans[3] to Century from Kurt Leswing and Dustin and were recorded in Century's general ledger in a separate loan account as follows:

| | Loans—Dustin and Leswing | | |
| | Leswing | Dustin | Total |
| --- | --- | --- | --- |
| Dec. 31, 1960 (gain less interest expense) | $1, 204. 81 | $1, 204. 81 | $2, 409. 62 |
| Dec. 31, 1961 (gain less interest expense) | 6, 019. 87 | 6, 019. 86 | 12, 039. 73 |
| Balance Dec. 31, 1961 | 7, 224. 68 | 7, 224. 67 | 14, 449. 35 |

The loss in 1962 as well as certain interest expense was treated in Century's general ledger as a reduction to the same loan account, as follows:[4]

| | Leswing | Dustin | Total |
| --- | --- | --- | --- |
| Balance Dec. 31, 1961 | $7, 224. 68 | $7, 224. 67 | $14, 449. 35 |
| Dec. 31, 1962 (loss) | (2, 956. 08) | (2, 956. 07) | (5, 912. 15) |
| Dec. 31, 1962 (interest expense) | (145. 00) | (145. 00) | (290. 00) |
| Balance Dec. 31, 1962 | 4, 123. 60 | 4, 123. 60 | 8, 247. 20 |

Century's books show no change to this loan account during 1963 and 1964, but merely reflect a carryforward of the balance of $4,123.60 for both Leswing and Dustin.

Dustin and Kurt Leswing had also agreed, though not in writing, that they would not be personally liable on the other's loans to Century. It was furthermore the understanding that Ellie Leswing would not be personally liable on the loans made by Dustin to Century.

The loans were made in order to facilitate the production of the civic series and the Canadian series which were to be submitted for

[3] It is not clear from the record whose funds were used to engage in the securities trading nor the details of how profits and losses were accounted for. The parties stipulated that the advances by Dustin to Century were valid loans. Since the respondent did not raise the issue as to whether these advances might have been contributions to capital rather than debt, we have not pondered the question and have treated the advances as debt for the purpose of our decision. See *Joseph W. Hambuechen,* 43 T.C. 90.

[4] The record does not disclose the basis for this entry in the general ledger.

adoption in 1961. The loans were also made to enable Century to hire a salesman with the hope that he could increase Century's direct sales to the local school boards to the point where Century would be showing a profit instead of a loss.

The loans made by Leswing and Dustin were not evidenced by a note nor were they secured by any form of collateral, nor did they bear any interest. They were ultimately repaid in 1965. Dustin thought the loans were worthless on December 31, 1961, and therefore claimed a bad debt loss on his 1961 income tax return.

The balance sheet of Century, as reflected on its 1961 income tax return, was as follows:

| ASSETS | | LIABILITIES AND CAPITAL | |
|---|---|---|---|
| Cash | $430. 11 | Accounts payable | $3, 456. 16 |
| Notes and accounts receivable | 125. 00 | Notes payable | 12, 000. 00 |
| Inventories | 19, 850. 00 | Notes and loans payable— partners | 14, 449. 35 |
| Depreciable assets | 1, 470. 70 | Partners' capital accounts | 16, 220. 30 |
| Goodwill | 21, 250. 00 | | |
| Bond | 3, 000. 00 | | |
| | | Total liabilities and capital | 46, 125. 81 |
| Total assets | 46, 125. 81 | | |

Certain assets and liabilities were not reflected on Century's balance sheet as of December 31, 1961, as shown above. The assets not reflected were accounts receivable of approximately $1,500 for books which had been sold directly to schools and for which Century had not been paid. The liabilities not reflected totaled approximately $12,121.67. This amount consisted of an account payable to the firm of Gregory & Falk, lithographers, of $9,621.67, which was in dispute, royalties to authors and artists of approximately $2,000, and an amount due to a bookkeeper of $500. Thus the book value of the assets of Century on December 31, 1961, was approximately $47,625.81, while the liabilities amounted to approximately $42,027.18, exclusive of partners' capital accounts.

Century's inventory on December 31, 1961, consisted entirely of textbooks which had been submitted for adoption and which had been rejected. As a general rule in the textbook-publishing industry, two factors must be present for a book (bound volumes, copyright, and plates) to be of any realizable value once it has been submitted for adoption and subsequently rejected. The nature of the book must be such that it has appeal in States other than that in which the book is submitted—in other words, the book must have a nationwide appeal, and the publisher must have a marketing organization which could successfully sell the book to the larger market. Even though Century did make limited sales of one or two of its books in States other than

California, Century did not have the capability to engage in the nationwide market. Therefore, Century's inventory on December 31, 1961, had little readily realizable value as compared to the book value of $19,850 reflected on Century's balance sheet for December 31, 1961.

Also the value assigned to goodwill on the balance sheet was doubtful on December 31, 1961, since Century had operated at a loss every year since its formation in 1958 and was without working capital. Thus, the readily realizable value of Century's assets on December 31, 1961, was approximately $6,525.81 while the liabilities on the same date, disputed and undisputed, were approximately $27,577.83, exclusive of the partners' loan and capital accounts. Including the loans from the partners, the liabilities were approximately $42,027.18. Consequently, Century appears to have been insolvent on December 31, 1961.

Pacific National Bank made a $5,000 unsecured loan to Century on or about June 2, 1961. The loan was subsequently renewed several times until repaid on August 6, 1962. Dustin and Kurt Leswing were coendorsers on all of the notes.

In spite of its insolvent status at the end of 1961, Century continued to actively conduct business in its usual manner until its dissolution in 1964, hereinafter explained.

In 1962 Century entered into profit-sharing agreements with joint venturers (authors and lithographers) for the publication of three books. The manuscript work on one of the books, "California Our Home," a geography book, was begun in October 1961 by one of its coauthors with the aid of Century's editor. The bulk of the work on this book was done in 1962. Ellie Leswing was coauthor and did most of her work in 1962. The book was printed in 1962, submitted for adoption in 1963, and adopted by the board of education in 1964 as a supplemental text. Century received a gross amount of about $85,000 upon adoption of this book but after paying its joint venturers their share and paying for rather extensive revisions required by the board, Century realized a net profit of less than $10,000 on this book.

A second book, "California's Own History," was begun in 1962 with the bulk of the work also being done in 1962. The book was submitted in 1963 and was adopted as a basic text in 1964 by the board of education. Century received an initial gross payment of about $300,000 on this book out of which it had to pay the joint venturers their share.

The third book, "Windows on the Pacific," was the last of the publications submitted for adoption. Ellie Leswing was also a coauthor of this book. It was submitted in 1963, but was rejected by the board of education in 1964.

Certain matters pending between Dustin and the Leswings regarding Century were submitted to arbitration under an arbitration agreement dated August 20, 1964. In January 1965 an award of arbitration was entered under which it was determined, *inter alia*, that Century was considered dissolved as of July 28, 1964, and that the amount due Dustin with respect to his loan should be paid by Century. The loan, then amounting to about $4,123.60, was satisfied in full in September 1965.

In 1965, Gregory & Falk, a firm of lithographers, brought suit against Century to collect on a debt. A judgment was entered against Century, and in 1966 Century paid the amount due plus interest.

During its existence, except for the arbitration proceeding and the suit by Gregory & Falk, Century was not engaged in any other litigation, did not default on any debts, notes, or other obligations, did not have any outstanding and unpaid judgments, and did not go into any form of bankruptcy, voluntary or otherwise.

On March 15, 1962, Dustin submitted a personal financial statement to the Bank of America in connection with a loan of $5,000 to Prior & McClellan. Dustin had signed the note as senior partner. On the financial statement Dustin reflected as an asset an interest of $17,000 in Century. Also, in a financial statement dated February 28, 1962, and submitted on April 4, 1962, to Pacific National Bank of San Francisco, Dustin placed a value of $17,000 on his partnership interest in Century.

On August 31, 1962, Dustin submitted a balance sheet of his personal assets to the Bank of California in connection with a mortgage on a home he had recently purchased. Dustin did not list his interest in Century as an asset, but did note that he was contigently liable on notes of Century in the amount of $17,000.

ULTIMATE FINDING

Century's debt to petitioners did not become worthless in 1961.

*Issue 2. Capital Expenditure v. Business Expense*

Capitol Broadcasting Co. (hereinafter referred to as Capitol) was incorporated under the laws of the State of California on November 30, 1960. Its original shareholders and its shareholders at all times material hereto were A. J. Krisik and Dustin, who owned respectively 1,000 shares and 198 shares of the $10 par value common stock of Capitol.

Capitol duly filed its election to be taxed as a small business corporation and such election was in effect for the year 1961. Capitol reported

its income on the basis of a fiscal year ended November 30. Dustin's investment in Capitol on November 30, 1961, was $1,980.

On December 3, 1960, Capitol entered into an agreement under which it agreed to acquire all of the stock of KGMS, Inc., a California corporation, the owner and operator of radio broadcast station KGMS, Sacramento, Calif. Pertinent parts of the agreement are as follows:

Such transfer and sale from Sellers to Buyer [Capitol] cannot be effectuated unless and until the Federal Communications Commission (hereinafter called "Commission") grants its consent thereto. Accordingly, this Agreement is made expressly subject to obtaining the prior consent of the Commission to the transfer of control of KGMS, Inc., * * * Should the consent of the Commission to this transfer of control not be obtained within a period of 150 days following the acceptance of the application for filing, this Agreement may be terminated by either party upon written notice to the other, and upon such termination, all obligations hereunder shall cease; *provided,* however, that if the failure of the Commission to grant its consent shall be due to the fault of, or deficiency in, the application of either the Buyer [Capitol] or the Sellers, not rectified by amendment, then the party responsible for such fault or deficiency shall not have the right to terminate this Agreement until a period of 210 days has elapsed after the application has been accepted for filing.

\*       \*       \*       \*       \*       \*       \*

At the time of the signing of this Agreement, Buyer [Capitol] will deposit in escrow an additional Ten Thousand Dollars ($10,000.00) with Edwin Tornberg & Co., making a total of Fifteen Thousand Dollars ($15,000.00) deposited in escrow with said broker. If the terms of this Agreement are not fulfilled by Buyer [Capitol], said Fifteen Thousand Dollars ($15,000.00) shall be paid to the Sellers, as liquidated damages. If this Agreement is not consummated due to the fault of the Sellers, or if it is not consummated through the fault of neither the Buyer nor the Sellers, said sum shall be returned to the Buyer [Capitol];

\*       \*       \*       \*       \*       \*       \*

Buyer [Capitol] knows of no fact that disqualifies it from becoming the licensee of Stations KGMS * * * and prior to the closing hereunder neither it nor its stockholders will do any act which will disqualify Buyer [Capitol] from becoming the licensee of siad [sic] stations;

During its fiscal year ended November 30, 1961, Capitol incurred expenses of $12,460 for legal, engineering, and accounting fees and other expenses incurred in connection with hearings before the Federal Communications Commission (hereinafter referred to as FCC) with respect to the transfer of control of the radio-broadcasting license of station KGMS to Capitol. These expenses were claimed as a deduction by Capitol for its fiscal year ended November 30, 1961. Respondent disallowed the deduction of these expenses and as a result thereof, reduced Dustin's distributive share of the net loss suffered by Capitol which Dustin claimed in his 1961 income tax return. One thousand five hundred dollars of the expenses in question represents the amount that would have been charged by Capitol's attorney in connection

with the transfer of the license if a hearing before the FCC had not been required. Dustin has conceded that the $1,500 was properly a capital expenditure and was correctly disallowed as a deduction by the respondent.

The hearing was predicated upon the fact that the owners of the subscribed stock of Capitol also owned the controlling interest in Argonaut Broadcasting Co., licensee of KFAX radio station in San Francisco, Calif., and KFIV, Inc., licensee of KFIV radio station in Modesto, Calif. The radio signals of KGMS, KFAX, and KFIV overlapped to a small extent. The policy of the FCC at the time Capitol filed its application for transfer of control of KGMS was that it disapproved of any overlap of stations controlled by the same interests within a 2 millivolt contour, the area within which each radio signal could be picked up clearly. The overlap of KGMS, KFAX, and KFIV was within a half millivolt contour, an area much larger than the 2 millivolt contour. Some of the Commissioners of the FCC, however, became concerned, at the time of the filing of the application by Capitol, about the concentration of control of radio stations; they did not want the same owners controlling the news and editorials of more than one station where the same audience could be reached.

It had not been anticipated by Capitol, nor did it have any reason to anticipate, that a hearing before the FCC would be required in connection with the purchase of control of KGMS, Inc. In May 1962 the FCC approved the transfer of control of the radio broadcast license to Capitol.

The hearing before the FCC did not enhance the value of station KGMS. While an FCC hearing is pending, regarding the transfer of control of a radio station, the station may lose valuable personnel and advertisers. Knowing that the station is going to be sold and not knowing whether they will be retained, employees of such a station tend to look for other positions. During the time the FCC hearing regarding KGMS was pending, the general manager of KGMS resigned. Also, advertisers do not like to continue long-term contracts with a station that is changing hands since they do not know whether the owners will continue the same programing.

### Issue 3. Late Filing of Return

Petitioners filed their 1961 joint Federal income tax return between October 15, 1962, and October 17, 1962. Dustin prepared the return with the assistance of a junior accountant in the accounting firm of which Dustin was a senior partner.

Between January 1 and April 15, 1962, Dustin, as a partner in an accounting firm, prepared or checked an estimated 100 returns of all

kinds. In addition, a group of Dustin's clients had entered into various transactions in 1961 which required a substantial amount of Dustin's time in the early part of 1962 in order that certain difficulties encountered could be cured.

On April 15, 1962, petitioners requested an extension of time within which to file their return, but the respondent rejected petitioners' request. For at least 5 or 6 years prior to 1961, the petitioners had requested and received extensions of time for filing their return for those years. In 1961, most of Dustin's requests for extensions of time to file returns on behalf of his clients were also refused whereas they had been granted in earlier years.

During the period from January 1, 1962, until petitioners' 1961 return was filed, Dustin was working long hours, including many nights and weekends. Petitioners' 1961 return was the longest and most complicated they had ever filed. The entire amount of income tax due from petitioners, as reflected on their return, was paid pursuant to their declaration of estimated tax.

ULTIMATE FINDING

Petitioners' late filing of their 1961 income tax return was due to willful neglect and not to reasonable cause.

OPINION

### Issue 1. Worthless Debt

The first issue for our decision is whether advances made by Dustin to Century were worthless at the end of 1961.

Section 166(a)(1), I.R.C. 1954, allows a deduction for "any debt which becomes worthless within the taxable year." Thus, we must determine objectively from all the surrounding facts and circumstances whether the debt due Dustin from Century actually became worthless in 1961, the burden of proof being upon the petitioners. *Earl V. Perry*, 22 T.C. 968 (1954).

In order to satisfy their burden of proof, the petitioners must show that the debt had some value at the end of 1960 and that it had become worthless by the end of 1961. This means a lack of potential value as well as current liquid value. Worthlessness must be determined by objective standards; generally this burden is met by showing that some identifiable event occurred during the course of the year which effectively demonstrates the absence of potential value, although such is not indispensable. *Orrin W. Fox*, 50 T.C. 813, on appeal (C.A. 9, Mar. 13, 1969); *Earl V. Perry, supra.* See *Charles W. Steadman*, 50 T.C. 369, on appeal (C.A. 6, Jan. 3, 1969); *Sterling Morton*, 38 B.T.A.

1270, affd. 112 F. 2d 320. The unsupported opinion of the taxpayer alone that the debt is worthless will not usually be accepted as proof of worthlessness. *Orrin W. Fox, supra; R. A. Bryan,* 32 T.C. 104, affirmed in part and remanded on other issues 281 F. 2d 238. Our conclusion is that petitioners have failed to sustain their burden of proof on this issue and therefore must be denied the deduction.

Prior to 1961 Century operated at a loss in each year of operation, its only income being from the limited sales of textbooks directly to schools in California. Century had submitted four textbooks in 1959 to the State of California for adoption, but all four were rejected. Then in the latter part of 1960, Century began work on two new books (a Canadian series and a civic series) in response to a call for bids dated November 1, 1960. Dustin and the Leswings were highly optimistic about both of these books, particularly the Canadian series since it was the only textbook being submitted pursuant to the call for bids for that particular subject.

It is true that at the end of 1961, or soon thereafter, both the Canadian series and the civic series had been rejected and Century had no books pending for adoption. Also, while Century's balance sheet as of December 31, 1961, reflected assets in excess of liabilities, several of the larger assets had little or no liquidating value, and Century was also low on working capital. Nevertheless, Century continued to operate as usual and there is no evidence that the partners considered discontinuing the business at that time; nor is there any indication that any of Century's creditors were demanding payment at that time. In fact, Century had already embarked on the preparation of another book prior to the end of 1961 which was ultimately sold to the board of education at a profit. The preparation of another book was also started in 1962 which was also adopted by the board of education, for which Century received a sizable initial payment. There is no indication that Century's operations were any different at the end of 1961 than they were at the beginning of that year. On financial statements filed with banks in the first part of 1962 petitioner included as an asset his interest in Century at a value of $17,000, and petitioner continued to endorse Century's note to a bank until it was paid off by Century in August of 1962.

Petitioners contend that Century was insolvent and without sufficient working capital at the end of 1961 and that these circumstances are sufficient evidence of worthlessness of the debt for purposes of the deduction under section 166(a). Insolvency, however, is not necessarily evidence of worthlessness, for a debtor's luck may change for the better in the future. *Sterling Morton, supra.*

In the *Morton* case, the Board stated at page 1278:

it is apparent that a loss by reason of the worthlessness of stock must be deducted in the year in which the stock becomes worthless and the loss is sustained, that stock may not be considered as worthless even when having no liquidating value if there is a reasonable hope and expectation that it will become valuable at some future time, and that such hope and expectation may be foreclosed by the happening of certain events such as the bankruptcy, cessation from doing business, or liquidation of the corporation, or the appointment of a receiver for it. Such events are called "identifiable" * * *; but, regardless of the adjective used to describe them, they are important for tax purposes because they limit or destroy the potential value of stock.

* * * If its assets are less than its liabilities but there is a reasonable hope and expectation that the assets will exceed the liabilities of the corporation in the future, its stock, while having no liquidating value, has a potential value and cannot be said to be worthless. The loss of potential value, if it exists, can be established ordinarily with satisfaction only by some "identifiable event" in the corporation's life which puts an end to such hope and expectation.

Even though the *Morton* case dealt with the worthlessness of stock, we feel that its rationale is equally applicable here.

The petitioners argue that the rejection of the books submitted in 1961 is the "identifiable event" which put to rest any hopes they had of collecting the debt. They point out that Century had suffered a loss in each year of its operation and that the Canadian series and the civic series were Century's ultimate hope for success. They assert that they determined the debt to be worthless at the end of 1961 by exercising sound business judgment and that the cases do not require them to be "incorrigible optimists," *United States* v. *White Dental Co.*, 274 U.S. 398 (1927), nor to wait until "some turn of the wheel of fortune may bring the debtor into affluence," *Minneapolis, St. Paul Railroad Co., et al.*, 164 Ct. Cl. 226 (1964).

While it is true the "taxing act does not require a taxpayer to be an incorrigible optimist, neither does it require him to be an incorrigible pessimist." *W. A. Dallmeyer*, 14 T.C. 1282 (1950). Rather the taxpayer should "strike a middle course between optimism and pessimism and determine debts to be worthless in the exercise of sound business judgment based upon as complete information as is reasonably obtainable." *Minneapolis, St. Paul Railroad Co., et al., supra.*

The nature of the book publishing business is such that a company can go for years without a successful book, recording losses each year, but then may "hit it big" with one book, recouping all its losses, and realize a substantial profit. The evidence before us shows that the quality of Century's work was such that its books were certainly competitive and capable of being adopted. In view of this, we feel it significant that the manuscript work on "California Our Home" (adopted as a supplemental text in 1964) was begun in October 1961 by one of its coauthors with the aid of Century's editor. Thus, even though the re-

jection of the books submitted for adoption in 1961 certainly dampened Century's hopes, the fact that Century continued its normal operations and the nature of the business being such as it was is a clear indication to us that nothing occurred in 1961 to destroy Century's hope for success nor its ability to achieve success.

Our conclusion that the debt still had value in 1961 is strongly supported by the fact that Century had not defaulted on any debts or other obligations and that it had no outstanding judgments against it. Also, the rejection of the books in 1961 did not force Century into bankruptcy, voluntary or otherwise. While it is somewhat of a mystery to us how the loss on trading in securities served to reduce the amount of Century's so-called debt to Dustin and Leswing, except as a bookkeeping entry, this bookkeeping entry would, on its face, indicate that Century had curtailed the debt in 1962.

Based upon all the facts and circumstances known on December 31, 1961, we conclude that the debt due Dustin from Century was not actually worthless, on that date, but in fact still had value. Consequently, petitioners are not entitled to a bad debt deduction for this debt for the year 1961.

### Issue 2. Capital Expenditure v. Business Expense

The second issue is whether legal fees, engineering fees, and accounting fees incurred by a subchapter S corporation in connection with proceedings before the FCC constitute capital expenditures or ordinary and necessary business expenses.

The respondent's notice of deficiency disallowing the deduction is as follows:

It is determined that Capitol Broadcasting Co., a Subchapter S Corporation, is not entitled to a deduction of $12,460.00 expended for legal, engineering, and accounting fees and other expenses incurred in connection with hearings before the Interstate Commerce Commission [sic] upon its application for a radio broadcasting license for Station KGMS, because these amounts were expended in order to secure a capital asset within the meaning of section 1221 of the Internal Revenue Code of 1954. Therefore your distributable share of the net loss of Capitol Broadcasting Co. is reduced from $2,432.18 to $372.56.

In the alternative, it is determined that you may not deduct a loss from Subchapter S corporation in excess of the basis of your investment in the corporation as provided by section 1374(c)(2) of the Internal Revenue Code of 1954.

We have already found in our Findings of Fact that Dustin's investment in Capitol on November 31, 1961, the close of Capitol's fiscal year involved, was $1,980, and that $1,500 of the expenditures constituted a capital expenditure. Thus, on this issue the remaining question is whether $10,960 expended by Capitol in connection with hearings before the FCC constitute an allowable deduction.

The petitioners contend that the test to be used in in determining whether a particular expenditure is a capital expenditure is whether it increases the value of the underlying asset. Sec. 1.263(a)–1, Income Tax Regs. It is their position that the expenditures made in connection with the hearings did not enhance the value of KGMS, Inc., but that in fact the value of KGMS, Inc., decreased because key employees resigned and advertisers refused to continue long-term contracts as a result of the hearings.

The portions of the regulations relied upon by petitioners are as follows:

Sec. 1.263(a)–1 Capital expenditures; in general.

(a) * * * no deduction shall be allowed for—

(1) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate, or

\*        \*        \*        \*        \*        \*        \*

(b) In general, the amounts referred to in paragraph (a) of this section include amounts paid or incurred (1) to add to the value, or substantially prolong the useful life, of property owned by the taxpayer, such as plant or equipment, or (2) to adapt property to a new or different use. * * *

The petitioners are misled in their reliance on the above-quoted regulations, for a careful reading of them will reveal that the term "made to increase the value of any property" is the predicate of the term "permanent improvements or betterments" and not of the term "new buildings." Here, we are dealing with expenditures incurred for the acquisition of additional capital assets (the stock of KGMS, Inc., with the attendant control of the license) and not with expenditures made to improve or better property already owned.

Respondent cites *Radio Station WBIR, Inc.*, 31 T.C. 803 (1959), and *KWTX Broadcasting Co.*, 31 T.C. 952 (1959), affirmed per curiam 272 F. 2d 406 (C.A. 5, 1959), as being directly in point and dispositive of this issue. We agree.

In *Radio Station WBIR, Inc., supra*, the petitioner incurred attorney fees, engineering fees, and other expenses in connection with hearings before the FCC regarding petitioner's application for a television construction permit and television license. The construction permit was not granted until 3 years after the expenses were incurred, and at the time of trial the application for the license was still pending before the FCC. The hearings were necessitated by the filing of opposing applications. In holding that the expenses were capital expenditures, we stated:

This Court has consistently held that the costs of acquiring licenses and franchises having useful lives in excess of 1 year are not deductible as business expenses but should be treated as capital expenditures. *Morris Nachman*, 12 T.C. 1204, affd. 191 F. 2d 934; *Tube Bar, Inc.*, 15 T.C. 922; *Pasadena City Lines, Inc.*,

23 T.C. 34; *Vermont Transit Co.*, 19 T.C. 1040, affd. 218 F. 2d 468, certiorari denied 349 U.S. 945. We think the facts and circumstances of the instant case require a similar conclusion, notwithstanding the license here sought had not, as of the date of the hearing, as yet been granted. * * *

In *KWTX Broadcasting Co.*, *supra*, the petitioner was also opposed in his application for a construction permit and television license before the FCC. The examiner recommended that the petitioner's application be granted. From this recommendation, the opposing party appealed to the FCC. While the appeal was pending, the opposing party agreed to withdraw its appeal if the petitioner would reimburse him for his expenses. The petitioner did this and claimed a deduction for the amount paid the opposing party as an ordinary and necessary business expense. We held the payment to constitute a capital expenditure. Furthermore, in attempting to amortize its expenses for attorney fees, traveling expenses, etc., in pressing its application for the construction permit and license, the petitioner conceded that these expenditures were capital in nature and not deductible as ordinary and necessary business expenses.

The petitioners, in the instant case, contend that the above-cited cases are not controlling and are distinguishable from the facts of this case. They point out that those cases dealt with wholly expected and usual costs of acquiring a new television license, while here the expenditures above $1,500 were wholly unexpected and unusual and actually decreased rather than increased the value of the property involved. This argument is without merit, however, for the "decisive test is the character of the transaction which gave rise to the payment." *Radio Station WBIR, Inc.*, *supra* at 813. Regardless of whether the expenditures were expected or unexpected they were incurred for one purpose—the purchase of a capital asset having a life in excess of 1 year.

Lastly, the petitioners cite *Commissioner* v. *Longhorn Portland Cem. Co.*, 148 F. 2d 276 (C.A. 5, 1945) ; *Carlos Marcello*, T.C. Memo. 1964–299; and *L. B. Reakirt*, 29 B.T.A. 1296 (1934), affd. 84 F. 2d 996 (C.A. 6, 1936), as being analogous and supporting the claimed deduction. Those cases dealt with the deduction of attorney fees, respectively, for the successful defense of a suit to impose a fine or penalty, a charge of supplying false information in an application for an FCC license, and a condemnation suit. We fail to see the relevance of these cases to the issue before us and therefore simply dismiss them as being clearly distinguishable.

Based upon our above reasoning and upon the authority of *Radio Station WBIR, Inc.*, *supra*, and *KWTX Broadcasting Co.*, *supra*, we conclude that the expenditures in question were capital expenditures and were not deductible as ordinary and necessary business expenses.

## Issue 3. Late Filing

The final issue before us is whether the late filing of petitioners' 1961 income tax return was due to reasonable cause or willful neglect.

Section 6651(a), I.R.C. 1954, imposes a penalty for the late filing of a return unless the late filing is due to reasonable cause. The regulations promulgated under section 6651 provide in part: "If the taxpayer exercised ordinary business care and prudence and was nevertheless unable to file the return within the prescribed time, then the delay is due to a reasonable cause." Sec. 301.6651–1(a)(3), Income Tax Regs.

Dustin is a certified public accountant and has been in the accounting profession since 1946. Needless to say, he was well aware of the requirement to file a timely return.

Dustin testified that he was physically unable to file the return before October 17, 1962, because from January 1, 1962, until his return was filed, he was working 7 days a week and 5 nights of the week. He testified that this was necessary due to the vast amount of work required of him by the accounting firm of which he was a senior partner and by the personal business transactions he had entered into. Dustin also testified to the fact that his 1961 return was by far the longest and most complicated he had ever filed.

In spite of the fact that Dustin requested an extension for the filing of his return and that we do not doubt that Dustin was extremely busy during this time, we do not feel that this is a reasonable cause for the filing of a return 6 months after its due date. The court in *First County Nat. B. & T. Co. of Woodbury, N.J.* v. *United States*, 291 F. Supp. 837 (D.N.J. 1968), stated: "A plea of 'too busy' is insufficient to relieve the taxpayer or his legal representative of the obligation imposed by statute to make timely filing."

Even if Dustin worked 7 days a week and 5 nights a week, frequently until 1 or 2 o'clock in the morning, which we find highly doubtful, we are of the opinion that a person exercising ordinary business care and prudence would not take on such a load that he could not fulfill his own legal obligations within the required time. We therefore conclude that petitioners' late filing of their 1961 return was due to willful neglect and not to reasonable cause. The addition to tax for late filing is therefore approved.

*Decision will be entered for the respondent.*