WILLIAM R. HILL AND BEATRICE J. HILL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hill v. Commissioner
Docket No. 18716-82.
United States Tax Court
T.C. Memo 1987-424; 1987 Tax Ct. Memo LEXIS 421; 54 T.C.M. (CCH) 274; T.C.M. (RIA) 87424; August 25, 1987. *421 During 1971-1975, petitioner-husband advanced funds to five limited partnerships in which he was the general partner. The partnerships accrued on their books the interest payable on these advances but never actually paid this interest. On their 1977 tax return, petitioners claimed a bad debt deduction in the total amounts shown as interest payable on the partnerships' books. All five partnerships were operating partnerships as of December 31, 1977, and for years afterward. Held: petitioners have not met their burden of proving that they were entitled to a bad debt deduction for 1977. Gregory A. Keer, for the petitioners. Eugene P. Bogner, for the respondent. CHABOT
MEMORANDUM FINDINGS OF FACT AND OPINION CHABOT, Judge: Respondent determined a deficiency in Federal individual income tax against petitioners for 1977 in the amount of $ 17,114. The issue for decision is whether petitioners are entitled to a bad debt deduction under section 166[1] in the amount of $ 33,347.50 FINDINGS OF FACT Some of the facts have been stipulated; the stipulation *422 and the stipulated exhibits are incorporated herein by this reference. When the petition was filed in the instant case, William R. Hill (hereinafter sometimes referred to as "Hill") and Beatrice J. Hill, husband and wife, resided in Cincinnati, Ohio. Hill is the general partner in various limited partnerships involved in acquiring and developing low income rental property in the Cincinnati area financed by the Department of Housing and Urban Development (hereinafter sometimes referred to as "HUD"). Between late 1970 and 1975, Hill syndicated various projects through eight limited partnerships, known collectively as the Northern Projects. Hill was the sole general partner in each of the Northern Projects partnerships. As general partner, Hill had a 5-percent interest in each partnership's profits and losses. Both Hill and the partnerships kept their books and records and filed income tax or information returns on a calendar year basis. The partnerships kept their books and records on an accrual method of accounting. Because of construction cost overruns during 1971 through 1975, Hill advanced money to five of the partnerships. He charged 8-percent interest on the amounts advanced. *423 At the end of each of the years 1971 through 1977, the partnerships accrued the amounts of interest on their books for the advanced made to them by Hill and took deductions for income tax reporting purposes for the interest accruals. Although the partnerships never actually paid to Hill the amounts of interest accrued on their books as payable to him, petitioners reported this interest as income as their tax returns for the appropriate years. As of the end of 1977, the five partnerships which received advances from Hill had credit balances in their accrued interest accounts payable to him as shown in table 1. Table 1
Partnership [2]
Amount
Justine Apartment Company
$ 2,171.11
Commodore Apartment Company
6,940.04
Tina Apartment Company
662.62
Karen Apartment Company
23,006.33
Jan Apartment Company
567.40
Total
$ 33,347.50
[2]
All the partnerships in the Northern Projects had similar partnership agreements. The partnership agreement for Karen Apartment Company, entered into in August 1971, provides in relevant part, as follows: 12. The Partnership shall borrow whatever amounts *424 may be required for the development and construction of the property [real property in Cincinnati] and to meet the expenses of operating the property, secured by a first mortgage on the property insured by the Federal Housing Administration. * * * If such mortgage is insufficient for development and construction of the property and to meet the expenses of operating the property, the General Partner shall lend the required funds to the Partnership, up to the gross sponsor's fee. * * * 16. Unless prohibited by FHA rules and regulations, the Partnership may borrow additional sums from any sources, including any Partner, and may pay reasonable interest thereon. * * * If any Partner shall loan any monies to the Partnership, the amount of any such loan shall not be an increase of his capital contribution * * *; but the amount of any such loan shall be an obligation of the Partnership to such Partner, and unless otherwise provided and agreed shall be repaid to him without interest, * * * * * * 20. The Partnership and the General Partner shall be obligated to construct the Property in the manner set forth in the Construction Contract * * *. In addition, if the proceeds of the Mortgage *425 and other funds available to the Partnership are insufficient for such purpose, the General Partner shall furnish additional funds which shall be necessary to pay for the construction of the Property, up to the gross builder's and sponsor's fees. Such additional funds shall be furnished to the Partnership in the form of loans from the General Partner and such loans shall be evidenced by a Residual Receipts Note from the Partnership containing such provisions as shall be required by applicable FHA Regulations. Subject to FHA approval, the Partnership, in the discretion of the General Partner, may at any time make any payment of interest or principal on any such Residual Receipts Note, * * * In connection with a first mortgage financing for the Karen Apartment Company real estate (which is typical of the limited partnerships'mortgages), Karen Apartment Company entered into a HUD regulatory agreement in August 1971. This regulatory agreement (which is typical of the limited partnerships' agreements) provides in relevant part as follows: 6. Owners shall not without the prior written approval of the [Federal Housing] Commissioner: (a) Convey, transfer, or encumber any of the mortgaged *426 property, or permit the conveyance, transfer or encumbrances of such property; (b) Assign, transfer, dispose of, or encumber any personal property of the project, including rents, or pay out any funds, other than from surplus cash, except for reasonable operating expenses and necessary repairs; (c) Convey, assign, or transfer any beneficial interest in any trust holding title to the mortgaged property, or the interest of any general partner in a partnership owning the mortgaged property, or any right to manage or receive the rents and profits from the mortgaged property; (d) Remodel, add to, reconstruct, or demolish any part of the mortgaged property or subject from any real or personal property of the project; (e) Make, or receive and retain, any distribution of assets or any income of any kind of the project except from surplus cash and except on the following conditions: (1) All distributions shall be made only as of or after the end of a semiannual or annual fiscal period, and only as permitted by the law of the applicable jurisdiction; all such distributions in any one fiscal year shall be limited to six per centum on the initial equity investment, which shall be determined by *427 the Commissioner; the right to such distribution shall be cumulative; (2) No distribution shall be made from borrowed funds or prior to the completion of the project, or when there is any default under this agreement or under the note or mortgage; (3) Any distribution of any funds of the project, which the party receiving such funds is not entitled to retain hereunder, shall be held in trust separate and part from any other funds; (4) There shall have been compliance with all outstanding notices of requirements for proper maintenance of the project. * * * 13. As used in this Agreement the term: * * * (g) "Surplus Cash" means any cash remaining after: (1) the payment of: (i) All sums due or currently required to be paid under the terms of any mortgage or note insured or held by the Federal Housing Commissioner; (ii) All amounts required to be deposited in the reserve fund for replacements; (iii) All obligations of the project other than the insured mortgage unless funds for payment are set aside or deferment of payment has been approved by the Commissioner; and (2) the segregation of: (i) An amount equal to the aggregate of all special funds required to be maintained by the project; *428 (ii) All tenant security deposits held; * * * Table 2 shows the year-end balances, exclusive of interest, as to advances by Hill. Each amount in parentheses is owed by the respective partnership to Hill, while each other amount is owed by Hill to the Partnership. Table 2
Year
Justine
Karen
Commodore
Tina
Jan
1971
$  -0-     ($ 134,323.35)
($ 78,973.00)
($ 8,250.00)
($ 1,614.15)
1972
(48,173.00)
(115,123.35)
(43,172.39)
(4,350.00)
-0-
1973
(28,673.00)
(40,895.55)
(11,729.00)
2,936.12 7,030.00 1974
3,912.56 (19,969.96)
371.00 (463.88)
2,470.00 1975
15,072.56 (32,271.96)
(4,829.00)
(5,263.88)
(5,270.00)
1976
13,972.56 (22,571.96)
(3,929.00)
(4,363.88)
(7,770.00)
1977
13,972.56 (22,571.96)
(3,929.00)
(4,363.88)
(7,770.00) The partnership rental properties in the Northern Projects were managed by Metro Management, Inc., a corporation wholly owned by Hill. Hill received a salary of $ 59,999.94 from Metro Management, Inc., in 1977. Petitioners reported Hill's partnership syndication activities on Schedule C. On the Schedule C which is part of their 1977 tax return, petitioners claimed a bad debt deduction in the amount of $ 33,347.50 with respect to the amounts shown as interest payable on the partnerships' books. Petitioners' *429 1977 tax return was sent to the Internal Revenue Service on July 15, 1978, petitioners having been granted extensions of time to file this tax return. In December 1978, each of the five partnerships which had received advances from Hill debited its accrued interest payable account and credited the miscellaneous income account for the full amount of interest owed to Hill. The limited partners of the affected partnerships never voiced any objection to accruals of interest payable to Hill, and they never at any time requested that the partnerships reverse the accruals on the partnerships' books. Petitioners have never claimed a bad debt deduction for the underlying advances Hill made to the five partnerships. None of the five partnerships receiving the advances has made an adjusting or reversing entry to the liability account recording underlying advances from Hill. The five partnerships were all operating partnerships as of the end of 1977 and 1978, and continued to be operating partnerships into 1984. In the notice of deficiency, respondent disallowed the bad debt deduction claimed on petitioners' 1977 tax return. OPINION Petitioners contend that Hill's advances to the five partnerships *430 gave rise to bona fide debts to him, that he reasonably charged interest which the partnerships accrued but did not actually pay, that the unpaid interest constituted additional debts, that in 1977 Hill concluded that the interest debts (but not the underlying debts from his advances to the partnerships) were "void ab initio", that he thereupon forgave the interest debts, and that petitioners are entitled to deduct these forgiven interest debts as business bad debts. Respondent agrees that Hill's advances to the five partnerships gave rise to bona fide debts to Hill, that Hill reasonably charged interest, and that the unpaid interest constituted additional debts. [3] *431 Respondent contends that petitioners are not entitled to a bad debt deduction for 1977 because (1) petitioners failed to show that Hill had a basis in the interest debts, (2) petitioners failed to prove the worthelessness of the interest debts, (3) if the interest debts are worthless then that is because Hill voluntarily forgave these debts and this forgiveness constitutes contributions to the partnerships' capital by Hill, and (4) if any deduction is allowable then it is not allowable for any year before 1978. [4]
We agree with respondent's second and fourth contentions. Section 166(a)[5] allows deductions for worthless debts. Petitioners do not claim that the interest debts are deductible as partially worthless debts (sec. 166(a) (2)) and so we consider whether they are deductible as wholly worthless debts (sec. 166 (a) (1)). A debt is deductible under this provision only for the year in which it becomes wholly worthless. Dustin v. Commissioner,53 T.C. 491, 501 (1969), affd. 467 F.2d 47, 48 (CA9 1972); see Holland v. Commisioner,728 F.2d 360, 362 (CA6 1984), affg. a Memorandum Opinion of this Court. [6] This is a factual matter, as to which petitioners have the burden of proof, not only as to whether the interest debts became worthless at all but also as to whether they became worthless in a year in issue. Dustin v. Commissioner, supra; *432 see Holland v. Commissioner, supra; see also Boehm v. Commissioner,326 U.S. 287, 293 (1945). It is generally accepted that the year of worthlessness is to be fixed by identifiable events which form the basis of reasonable grounds for abandoning any hope of recovery. Dustin v. Commissioner, supra; see Holland v. Commissioner, supra; see also Boehm v. Commissioner,326 U.S. at 291-292. The record herein is woefully inadequate to sustain petitioners' burden of proof on this issue. There was no demand for payment or any evidence that the partnerships were insolvent as of the end of 1977 or even that they were experiencing financial hardship. [7] Rather, the scant evidence on this issue in the record shows that the partnership agreement provided for the payment of interest on advances *433 from partners, the partnerships made payments to Hill on the underlying advances, [8] and the partnerships continued to be in business for many years after the end of the year in issue. The only evidence that the debt became worthless during 1977 is Hill's vague and unsupported testimony that because he became concerned about the propriety of charging interest on the advances he made to the five partnerships he forgave the interest which had accrued. Hill testified that the HUD regulatory agreement prohibited the charging of interest on the loans. Our reading of that document does not reveal such a prohibition. Moreover, it appears that Hill never contacted HUD officials to determine whether the interest was, in fact, improperly accrued and there is no evidence that HUD officials asked that the interest accrual be reversed. In his testimony, Hill acknowledged that, notwithstanding the *434 provisions of the HUD regulatory agreement, the limited partnerships repaid many of his loans and, in fact, at one time or another he owed money to four of the five limited partnerships in question. See table 2, supra. Petitioners have not explained how it is that the regulatory agreement prohibited payment of interest to Hill on loans that he made but permitted repayments of the loans and, indeed, permitted the limited partnerships to make loans to Hill. Further, petitioners have not explained how this 1971 regulatory agreement precipitated a worthlessness in 1977. Hill testified that the impact of the last paragraph of section 16 of the partnership agreements of the limited partnerships (set forth in relevant part in the Findings of Fact, after table 1, supra) was that he was not allowed to charge interest on loans made to these partnerships. However, the partnership agreements plainly permit the partners to agree that the loans would bear interest, and the parties have stipulated that Hill in fact charged interest and the limited partnerships accrued the interest obligations on their books. Also, the Karen Partnership agreement was entered into in August 1971. The record would *435 not support a conclusion that that partnership agreement is a basis for finding that any interest debt became worthless in 1977. Hill testified that his accountant brought to his attention a HUD manual that forbade the charging of interest without the prior permission of the Federal Housing Commissioner. Hill testified that when he came to this conclusion, he took the deduction on petitioners' tax return and included the amount of the forgiven interest debt as income for the partnerships. He testified that the partnerships' books for 1977 had already been closed and so the partnerships' adjustments were made for 1978. We have found, and Hill acknowledged, that the partnerships kept their books on a calendar year basis. If the partnerships' books were closed for 1977 by the time Hill had determined that the interest debts were worthless, then we believe that Hill did not make that determination until 1978. Thus, petitioners have failed to carry their burden of proving that the debts became worthless in 1977. Under these circumstances, we do not have to determine whether Hill should be treated as having made a capital contribution to the partnership or what Hill's basis was in the *436 interest debts. [9] We hold for respondent. [10] *437 Decision will be entered for the respondent.
Footnotes
1. Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 as in effect for the year in issue. ↩
2. The partnerships involved had the following number of limited partners: Justine 6, Commodore 6, Tina 4, Karen 8, and Jan 7. ↩
3. This represents a concession that respondent erred in his notice of deficiency determination that "it has not bee shown that a bona fide debt existed." 4. Respondent does not respond to petitioners' contention that the interest debts are business debts. We take this as an implicit concession that any deduction otherwise allowable is not limited by section 166(d)↩. 5. SEC. 166. BAD DEBTS. (a) General Rule. -- (1) Wholly worthless debts. -- There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (2) Partially worthless debts. -- When satisfied that a debt is recoverable only in part, the Secretary may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction.↩
6. T.C. Memo. 1982-428↩. 7. Indeed, we note that the limited partners did not request that the partnerships reverse the accruals and that the reversing entries on the books of the partnerships were not made until December 1978. ↩
8. In fact, as of the end of 1977, Hill owed $ 13,972.56 to the Justine partnership. See table 2, supra.↩
9. Respondent maintains that petitioners failed to show that they had reported the interest income on their tax returns. At trial, Hill testified that they had done so. On opening brief, petitioners asked us to make the following finding of fact: 5. A bona-fide debtor-creditor relationship [sic] existed as the creditor intended to be paid the accrued interest (Tr. 28) and the debtor, the partnership entities on the partnership books for the years 1971 through 1977. [Sic] (stip. par. 5, Tr. 35). William R. Hill reported each year's accrued interest as income. The partnerships reported each year's accrued interest as an expense. (stip. par. 5, Tr. 28-29). The partnerships books accurately reflected these transactions by establishing [sic] for William R. Hill an accrued interest payable account by reflecting the accrued interest as a partnership expense. (stip. 5-9) [Emphasis supplied.]
On answering brief, respondent stated that he had no objection to this requested finding of fact. Accordingly, we have found that petitioners reported this interest as income on their tax returns for the appropriate years.↩
10. On opening brief, petitioners state as follows: The Statute of Mitigation [secs. 1311-1314] should apply to the limited partners as the Commissioner has taken a position inconsistent to their inclusion as income William R. Hill's bad debt deduction. Alternatively, the limited partners should receive the benefit of William R. Hill's deduction and be able to apply it for 1978. The short answer is that the limited partners are not before us in the instant case and so we will not decide their rights in this opinion. ↩