BEN W. SULLIVAN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Sullivan v. Commissioner
Docket No. 3793-71.
United States Tax Court
T.C. Memo 1976-218; 1976 Tax Ct. Memo LEXIS 183; 35 T.C.M. (CCH) 948; T.C.M. (RIA) 760218; July 13, 1976, Filed Ben W. Sullivan, pro se. [1]
*184 Richard D. Hall, Jr., and Frederick T. Carney, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Chief Judge: This case was assigned to and heard by Special Trial Judge Randolph F. Caldwell, Jr., pursuant to Rules 180 and 182, Tax Court Rules of Practice and Procedure. The parties have filed no exceptions of law or fact to Special Trial Judge Caldwell's report. The Court agrees with and adopts his opinion which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE CALDWELL, Special Trial Judge: This case is one of a group of 37 which were consolidated for trial but not for opinion. At the trial, evidence was received which bears upon every case in the group. Such evidence relates to certain contractual arrangements between the male petitioners' employers, Lockheed Aircraft Service Company (hereinafter, "Lockheed") and Dynalectron Corporation (hereinafter, "Dynalectron"), and the United States Air Force, as well as the employment arrangements between field team members (such as the male petitioners) and such employers. Respondent determined deficiencies in petitioner's Federal income taxes for the years 1967, 1968, *185 and 1969, in the respective amounts of $526.56, $1,454.50, and $1,685.31. He also determined additions to tax for late filing under section 6651(a) for 1967 and 1969, in the respective amounts of $58.28 and $289.92. The principal issue for decision, present in each year, is whether all or any portion of the per diem payments received by petitioner from Dynalectron is includible in his gross income for the years in which they were received, under section 61(a)(1) of the Internal Revenue Code of 1954; [2] and, if so, whether petitioner is entitled to deduct an amount equal to the includible per diem payments, as away-from-home traveling expenses under section 162(a)(2). There are two other issues for decision: (1) whether respondent correctly determined that petitioner had "other income" of $2,180.49 for 1969, through use of a source and application of funds computation; and (2) whether petitioner is liable for the determined additions to tax under section 6651(a) for 1967 and 1969. GENERAL FINDINGS OF FACT Petitioner filed his return for each of the years *186 involved with the Internal Revenue Service Center at Chamblee, Georgia. He resided in Mississippi at the time he filed the petition in the present case. Issue 1. --Per Diem/Travel Expense FINDINGS OF FACT Throughout the taxable years, petitioner was employed as a supervisor of several field teams by Dynalectron. That corporation, as well as Lockheed, had a contract with the United States Air Force in each of the years to provide field team services for the maintenance and modification of weapons systems (i.e., aircraft) and/or support equipment. These contracts were called "basic contracts" and the Air Force entered into such a contract with each of three different contractors. The contracts were for three years maximum duration, and those involved here were for the three fiscal years, July 1, 1967-June 30, 1968; July 1, 1968-June 30, 1969; July 1, 1969-June 30, 1970. The contract was firm for the first of the three years; but the Air Force had the unilateral right to extend the contract for the second and third years of the three-year period. The contracts were so extended by the Air Force insofar as both Lockheed and Dynalectron were concerned. (The record herein does *187 not identify the third contractor who had the basic contract.) The basic contract did not, of itself, award any work to be performed thereunder. It did specify the wage rates which would be paid for services rendered by employees of the contractor, if the contractor got work to be performed under the contract. The contract also contained the following provisions relating to the payment of per diem: (ii) Per Diem, not to exceed the applicable amounts set out below, when actually paid by the Contractor and approved by the Administrative Contracting Officer, shall be reimbursed to the Contractor, without regard to the duration of the assignment; provided, however, that no per diem shall be authorized or paid to any employee whose actual residence is within 50 miles of the work station to which the employee is assigned, nor shall any per diem be paid to any employee who actually resides at and commutes from his actual residence during the period of his employment, regardless of the distance between said residence and his assigned work station: (See (ii)(e) below). (a) In the CONUS (No quarters and messing facilities furnished by the Government) -- $11.00-Per day per man for Engineer *188 and Leadman and $9.00-Per day per man for the remainder. * * *
(e) For the purpose of this contract the term "actual residence" is defined as the fixed or permanent domicile of an employee. The employee shall certify to the location of his fixed or permanent domicile and this location, if accepted by the Contractor, shall be deemed, for the purpose of this contract, to be the employee's domicile in so far as per diem authorization against this contract is concerned. However, this does not relieve the Contractor of his responsibility to ascertain that the certification is valid. The opportunity for the contractor to perform under the basic contract arose from the issuance by the Air Force of a work order thereunder. Issuance of a work order was entirely within the discretion of the Air Force, and it alone had the discretion to select which one of the three holders of a basic contract that was to perform the work order. Performance under a work order might be at any place in the United States or at any place overseas where the Air Force maintained a base. Under the terms of the basic contract, work orders could only be issued during a given year of a basic contract. However, *189 completion of a work order actually issued during such year might be effected after the end of the year. When the Air Force had determined to issue a work order and had notified a contractor of its selection to perform that order, representatives of the Air Force and of the contractor would get together at a "pre-dock" meeting where the time for completion of the contract and the make-up of the contractor's projected field team complement would be worked out. Determination of the time of performance entailed fixing an input-output schedule -- the schedule which showed the number of units coming into the contractor for its maintenance and modification services per day or week or month, and the number of units to be completed by the contractor per day or week or month. After the projected field team complement had been worked out, the contractor would then proceed to get the team together. In assembling the team, the contractor would utilize two sources of manpower: (1) existing employees which it transferred from jobs under other work orders; and (2) new employees which it recruited. Whenever a contractor hired a new employee for field team work, that employee was advised *190 that he was subject to being sent anywhere that the contractor might be called upon to perform a work order, and that if the employee was unwilling to travel where thus directed to go, his only alternative was to resign. The employee was also advised that the contractor only had a basic contract for a year and that it had no way of knowing whether or when it would receive work orders under that contract. It was also made clear to the employee that, while the contractor would endeavor to continue to utilize the services of the employee after completion of the work order in connection with which he was hired, it could not guarantee any such further employment; and if none were available, the employee would be laid off. Neither Lockheed nor Dynalectron maintained any pool or central area where an employee who had completed an assignment could be sent pending the contractor getting another work order on which such employee could be used. Both Lockheed and Dynalectron were involved in the performance of work orders at Key Field in Meridian, Mississippi, during the years involved. [3]Lockheed had first come to Meridian in 1965 and it remained there until June 30, 1969, at which time *191 (although it did not lose its status as holder of one of the three basic contracts) it was supplanted by Dynalectron. During the fiscal year ended June 30, 1969, Lockheed received two work orders to be performed at Meridian; and during the succeeding fiscal year, Dynalectron likewise received two work orders. While in most instances, the contractor's field teams were sent to the location where the aircraft were located, in the case of the work orders performed at Meridian, the aircraft were brought by the Air Force to that work site from other locations. During the performance of a work order, the Air Force always had an on-site representative, monitoring the performance of the contractor. One of the areas of concern was to determine whether the field team was over strength or under strength, as well as the quality of work of the field team members. Instances occurred when the composition of the field team was changed as the result of the *192 recommendation of the Air Force's on-site representative. For this reason, as well as for the reason that the composition of the field team varied according to the nearness in point of time to the beginning or the end of the performance under the work order, the projected field team complement as worked out at the pre-dock meeting might vary as much as 10 to 20 percent during the performance of the contract. When an employee was hired, or rehired, by a contractor, he was required to certify to the contractor his "permanent or domicile" address (in the case of Lockheed) or his "fixed or permanent domicile" (in the case of Dynalectron). If the address so certified was further than 50 miles from the job site where the employee was to work and if the employee did not drive back and forth to work, irrespective of the address which he had furnished, he was paid the per diem mentioned and described above. The per diem payments made by the contractors were included in their invoices to the Air Force, solely for the purpose of being reimbursed. There wa no element of profit to the contractors in the per diem for which they sought reimbursement. Per diem paid to the field team employees *193 who qualified therefor was at the rate of $11 per day for a leadman and an engineer, and $9 per day for the other members of the field teams. Per diem was paid for seven days per week, although the regular work week for field team members was a 5-day, 40-hour week. Field team members also received per diem during their initial travel to a work site, for days of travel when transferred to different work sites, and for a maximum of three days for return to their homes, in the event they were laid off. They did not receive per diem during vacation periods; but they did receive per diem for three days up to a maximum of six days if they were sick. Neither Lockheed nor Dynalectron withheld Federal income tax from the per diem payments made to their employees. Petitioner, who has worked for Dynalectron ever since 1954, was on over 20 assignments throughout the United States, as well as in Puerto Rico, during the taxable years here involved. Respondent has conceded on brief that each of those assignments was temporary.
Petitioner advised Dynalectron that his "actual residence * * * fixed or permanent domicile" was at Route 3, Box 94, Winona, Mississippi. That is the address of *194 a 160-acre farm located in Montgomery County, Mississippi, where petitioner had been born. He has never married. Some time prior to 1966, petitioner and his parents entered into an arrangement whereunder they sold him the home place farm for $32,000, to be paid in a manner presently to be described. As part of the arrangement, petitioner was to provide a home for his parents so long as both of them lived, and for the life of the survivor after the first one died. Petitioner was to receive all the income from the farm and he was to bear all the expenses of it. So long as either of his parents were living, he was obligated to pay them or the survivor $1,000 per year to make sure that they had enough cash to meet their needs, such payments to apply to the $32,000 purchase price. At the death of the survivor, petitioner was to pay the three other children of his parents, an equal share of the balance due, after which he was to be the sole owner of the home place farm. Petitioner's father died in May 1966, and thereafter throughout the taxable years 1967 through 1969, petitioner's mother lived on the home place farm. Petitioner raised beef cattle and cotton on the farm. Petitioner *195 has always returned to the home place farm whenever he was able to do so. During the years 1967 and 1968 and up until August 1969, he returned there during his vacation periods and as well during se veral periods when he was laid off by Dynalectron owing to lack of work. On August 12, 1969, Dynalectron assigned petitioner to Key Field at Meridian where he remained for the rest of the year. Winona lies 110 miles northwest of Meridian. After being assigned to Meridian, petitioner returned to Winona every weekend. His mother's health was good until it began to fail in 1969; and she and petitioner (during the times he was in Winona) kept the farm in operation. Petitioner paid the county and city real estate taxes on the home place farm. He has done his banking with the Bank of Winona for over 25 years. Petitioner received per diem payments from Dynalectron in the amounts of $2,490 during 1967, $5,158 during 1968, and $4,007 during 1969, none of which did he include in income on his returns. Respondent determined in his statutory notice of deficiency that each of those amounts was includible in gross income in the year in which it was received, under section 61. OPINION *196 It must first be determined whether the per diem payments received by petitioner from Dynalectron during 1967, 1968, and 1969 are includible in his gross income for those years. It is believed that they are. In very broad language, section 61(a)(1) provides that "gross income means all income from whatever source derived." The Supreme Court has construed this "broad phraseology" to evince a Congressional intention "to tax all gains except those specifically exempted." Commissioner v. Glenshaw Glass Co.,348 U.S. 426, 430. The per diem payments were "undeniable accessions to wealth, clearly realized and over which the [petitioner had] complete dominion" ( Commissioner v. Glenshaw Glass Co., supra, p. 431); and thus they were gains. The Code contains no provision exempting per diem payments from taxation. Manifestly, then, the respondent was correct in including in petitioner's gross income the per diem payments which he received from Dynalectron in each of the years. Leo C. Cockrell,38 T.C. 470, 477-478; affd. (8th Cir.) 321 F.2d 504; Darrell Spear Courtney,32 T.C. 334, 341. [4]
*197 The question remains whether petitioner is entitled to deduct under section 162(a)(2) an amount equal to any part or all of the per diem payments included in his income for each of the years, as expenses of travel while away from home in pursuit of his trade or business as an employee of Dynalectron. Leo C. Cockrell,supra, p. 479. In the Cockrell case, it was pointed out that the Supreme Court, in Commissioner v. Flowers,326 U.S. 465, rehearing denied 326 U.S. 812, had laid down three requirements that a taxpayer must meet to be entitled to deduct away-from-home expenses: The expenses must be (1) reasonable and necessary traveling expenses, (2) incurred by the taxpayer while away from home, and (3) incurred in pursuit of business. In the present case, the parties differ only on the point of whether petitioner was away from home. In the case of Truman C. Tucker,55 T.C. 783, 786, the factors to be considered in determining whether a taxpayer should be treated as away from home for tax purposes were crystallized. It was there said: The purpose of allowing the deduction of living expenses while a taxpayer *198 is "away from home" is "to mitigate the burden of the taxpayer who, because of the exigencies of his trade or business, must maintain two places of abode and thereby incur additional and duplicate living expenses." Ronald D. Kroll,49 T.C. 557, 562 (1968). In furtherance of this purpose, when a taxpayer with a principal place of employment goes elsewhere to take work which is merely temporary, he may deduct the living expenses incurred at the temporary post of duty, because it would not be reasonable to expect him to move his residence under such circumstances. Emil J. Michaels,53 T.C. 269 (1969); Ronald D. Kroll,supra.For this purpose, temporary employment is the type which can be expected to last for only a short period of time. Beatrice H. Albert,13 T.C. 129, 131 (1949). On the other hand, if a taxpayer chooses for personal reasons to maintain a family residence far from his principal place of employment, then his additional traveling and living expenses are incurred as a result of that personal choice, and are therefore not deductible. Commissioner v. Flowers,supra; *199 Ronald D. Kroll,supra at 561-562; Floyd Garlock,34 T.C. 611, 614 (1960); Mort L. Bixler,5 B.T.A. 1181, 1184 (1927). Similarly, if a taxpayer accepts indefinite employment outside the vicinity in which he lives, but he does not change his family residence, the travel to his new place of employment and the additional living costs which he incurs there result, not from his employment, but from his decision not to move his residence. Rendell Owens,50 T.C. 477 (1968); Maurice M. Wills,48 T.C. 308 (1967), affd. 411 F.2d 537 (C.A. 9, 1969). Thus, the deductibility of traveling expenses and duplicate living expenses depends upon the ultimate question of whether the taxpayer, under all the circumstances, could reasonably have been expected to move his residence to the vicinity of his employment. Respondent has conceded on brief that each of petitioner's numerous assignments during the years here involved was temporary. The inquiry narrows to whether he maintained two places of abode, and more specifically whether he maintained a place of abode at the home place farm outside Winona *200 in Montgomery County, Mississippi.It is believed that he did. Petitioner was unmarried, but he did have a "family" in the person of his mother, for whom he was obligated under the agreement with his parents, as well as under the filial constraints resting upon a dutiful and devoted son, to provide a home as long as she lived. He did provide that home at the home place farm, and he furnished his mother money as and when she needed it to take care of her necessities. Petitioner was a farmer as well as a Dynalectron supervisor, and he carried on farming operations at the home place farm in each of the years. He returned to the home place farm at every opportunity that he could. In the foregoing circumstances, it is believed that the home place farm was petitioner's "tax home" for the purposes of section 162(a)(2) throughout 1967, 1968, and 1969. He was accordingly away from home under that statute while on each of his assignments during those years. He should therefore be allowed a deduction for each year under section 162(a)(2) of an amount equal to the per diem payments included in his gross income for each such year. Issue 2.--"Other Income" for 1969 FINDINGS OF FACT *201 In the statutory notice of deficiency, respondent determined that petitioner had additional "other income" of $2,180.49 for 1969. That amount was determined through use of a source and application of funds computation, as follows: Application of funds: Increase in bank account
$ 2,809.22
Payments on Pontiac auto
3,351.25
Payments on soil scoop
105.18
Six (6) bonds purchased
4,500.00
Loan made to brother
500.00
Repay petty cash fund
500.00
State tax paid
119.13
Federal income tax withheld
1,517.10
Social security tax withheld
372.36
Personal living expense
4,385.24
Total funds applied
$ 18,159.48
Source of funds: Farm loss reported on return
($ 2,710.80)
Depreciation deduction per return
1,807.75
Sale of assets
3,439.15
Loan received from brother
500.00
Salaries
7,756.86
Sign rent
100.00
Per diem received
4,007.00
Dividend income
408.18
1967 and 1968 income tax refunds
670.85
Total funds reported available
$ 15,978.99
Understatement of income
$ 2,180.49
As supervisor of a Dynalectron crew on an extended assignment covering portions of the year 1968 and 1969, and identified in the record as the Bremerton Tour, petitioner *202 expended in the latter part of 1968, $1,331.38 from his own funds for various expenses incurred by himself and members of the crew for traveling, post office box rental, typewriter rental, telephone service, and office supplies. On December 2, 1968, he submitted vouchers for reimbursement to Dynalectron's office in Fort Worth.In the following January or February of 1969, petitioner received reimbursement from Dynalectron in the amount of $1,331.38.
On or about December 20, 1968, petitioner made a loan of $800 from his personal funds to Donald Marstom, one of the members of his crew on the Bremerton Tour. Mr. Marstom repaid petitioner $800 in March or April of 1969. OPINION This issue may be disposed of quickly, and in petitioner's favor. The foregoing findings make it clear that petitioner had at least $2,131.38 of additional funds in 1969 -- reimbursement from Dynalectron ($1,331.38) and repayment of his loan to Mr. Marstom ($800.00) -- which should be added to the sources of funds shown by respondent in his source and application of funds. Both of such additional sources of funds are nontaxable. When they are added to the sources of funds shown by respondent in his computation, *203 they almost entirely eliminate the differential of $2,180.49 shown by respondent in such computation, which he characterized as "other income." Given the relative imprecision of indirect methods for computing income of a taxpayer, such as the source and application of funds method here involved, and being unconvinced that petitioner had any sources of taxable income other than those reported on his return which have not been challenged, it is believed that the remaining differential of only $49.11, which is deminimus, should not be charged as additional income to petitioner. This issue should be decided for petitioner. Issue 3.--Additions to Tax under Section 6651(a). FINDINGS OF FACT Petitioner filed his return for 1967, which was due to be filed on or before April 5, 1968, on March 17, 1969. He did not apply for or obtain any extension of time for filing his 1967 return. Petitioner filed his 1969 return, which was due to be filed on or before April 15, 1970, on September 4, 1970. He did not apply for or obtain any extension of time for filing his 1969 return. In April 1968, when petitioner's return for 1967 was due to be filed, the duties of his then recent *204 assignment on the Bremerton Tour occupied his time very fully and he also did not have all his records at hand. He made a rough calculation and concluded that a refund would be due and decided not to request an extension of the time to file. Petitioner was in Winona on leave of absence due to lack of work for Dynalectron from May 23, 1968, to June 5, 1968. Petitioner's late filing of his 1969 return was due to oversight.He did not realize that he had not filed on time until September 1970, when he consulted his accountant after respondent had raised the per diem/travel expense issue for earlier years. OPINION This issue is moot if this Court decides the first two issues in accord with the disposition thereof in this report. Petitioner would prevail on those issues, and the result would be that there would be no deficiencies upon which the additions to tax here involved could be predicated. Section 6651(a) provides for an addition to tax for failure to file timely a return, unless it is shown that such failure was due to reasonable cause and not due to wilful neglect.There is no question that the returns were late.Passing the question of whether petitioner's tardy filings *205 were due to wilful neglect, it does not appear that the late filing for either year was due to reasonable cause. Compare Herbert W. Dustin,53 T.C. 491, affd. (9th Cir.) 467 F.2d 47. * * * * *
In accordance with the foregoing, Decision will be entered under Rule 155. Footnotes
1. DeQuincy V. Sutton was counsel of record for petitioners at the time of trial, Mr. Sutton died in August 1974, shortly after the last brief was filed. There is presently no counsel of record for petitioner.↩
2. All section references are to the Internal Revenue Code of 1954, unless otherwise specified.↩
3. The petitioner-husband in the present case, as well as all the other husband-petitioners, worked at Key Field in Meridian. It is this work at Meridian that is the common element that prompted the consolidation of the cases for trial.↩
4. See also Fred W. Phillips,T.C. Memo. 1973-58↩.