THOMAS J. BRENNAN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Brennan v. Commissioner
Docket No. 266-75.
United States Tax Court
T.C. Memo 1977-115; 1977 Tax Ct. Memo LEXIS 325; 36 T.C.M. (CCH) 501; T.C.M. (RIA) 770115; April 21, 1977, Filed Thomas J. Brennan, pro se. David M. Berman, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioner's Federal income tax in the amounts of $1,398.80, $222.72 and $27,822.08 and additions to tax under section 6653(b), I.R.C. 1954, [1] in the amounts *327 of $1,562.90, $10,978.36, and $17,085.04 for the calendar years 1965, 1966 and 1967, respectively. In his answer, respondent in the alternative alleged additions to tax under section 6651(a) in the amounts of $349.70, $55.68 and $8,542.52 for the calendar years 1965, 1966 and 1967, respectively, and additions to tax under section 6653(a) in the amounts of $156.29, $1,097.84 and $1,708.50 for the calendar years 1965, 1966 and 1967, respectively. Some of the issues raised by the pleadings have been disposed of by agreement of the parties, leaving for decision the following: (1) Whether an advance of $3,050 made by petitioner in 1965 became worthless in 1965 or 1967; (2) whether amounts advanced by petitioner to an individual and a corporation, which became worthless in 1967, are deductible in full as a business bad debt or are limited to the deduction allowed for a nonbusiness bad debt; and (3) whether petitioner is liable for additions to tax under section 6653(b) or in the alternative, additions to tax under section 6651(a) and section 6653(a). FINDINGS OF *328 FACT Some of the facts have been stipulated and are found accordingly. Petitioner resided in Miami, Florida at the time the petition in this case was filed. He filed his individual Federal income tax returns for the calendar years 1965, 1966 and 1967 with the District Director of Internal Revenue at Jacksonville, Florida in June 1972. Petitioner was born in 1931 at Rochester, New York.Following graduation from high school in 1949, he entered the Marine Corps where he saw active duty in Korea. In May 1953, after his release from military service, he received back combat pay in the amount of approximately $800, which along with $200 of other funds, he invested in 100 shares of Haloid Corporation, the forerunner of Xerox Corporation. After his release from military service, petitioner entered Villanova University and graduated in 1956 with a bachelor of science degree in economics with a major in accounting, finishing eighth in his class of 52. While in college he continued to invest in stock of Haloid Corporation by saving approximately $25 to $30 a month during the school year and $200 a month during the summer months. Upon graduation from Villanova University, he entered *329 the University of Miami School of Law, and while a student was selected to be a member of and serve on the staff of the Law Review. He received his law degree in 1959, but on graduation day he was seriously injured in an automobile accident, which prevented him from working for a period of approximately 3 years. In October 1962 petitioner began doing office work in the law firm that was representing him in the law suit filed as a result of the automobile accident that had occurred on the day of his graduation from law school. This firm had been formed by two of petitioner's law school classmates who had become friends of petitioner's in law school. Petitioner initially performed the function of keeping the books for the firm, which included accounting work, the preparation of employment tax information and the firm's Federal income tax returns. Petitioner took the Florida Bar Examination in August 1963 and was admitted to the Florida Bar in November of that year. Thereafter, he became an associate in the firm performing matters that could be handled in the office, such as research and document preparation, while the two partners devoted a major portion of their time to trial *330 work. [2] He also continued to keep the books of the firm. In late 1964 the law firm obtained a new client by the name of Walter Shaw, an individual who had extensive knowledge in the area of telephone communications. In May 1965 Mr. Brennan went to Washington, D.C. on behalf of this client and while at a meeting there was apprised of the fact that licenses which would be beneficial for an owner of a telephone answering service were being granted with respect to ship-to-shore mobile telephones. Petitioner also learned at this meeting that the Federal government was broadcasting weather reports on a continuous basis on a radio frequency assigned for that purpose. [3]
*331 In 1965 petitioner and several other individuals, including his law partners and Walter Shaw, incorporated Shaw Electronics, Inc. (Shaw Electronics) under the laws of the State of Florida.Shaw Electronics was organized for the purpose of inventing, experimenting and marketing telephone and electronic equipment. At a stockholders meeting on March 24, 1965, petitioner was elected secretary-treasurer and received 15 percent of the common stock of the corporation. Shaw Electronics was organized with $500 stated capital, all of which was advanced by petitioner. In addition petitioner agreed to advance sums of money to the corporation if an item were to be developed by the corporation that could be patented. During 1965 petitioner advanced $3,050 to Walter Shaw so that Mr. Shaw could satisfy some of his personal obligations. The purpose of the advance was to alleviate some of Mr. Shaw's personal financial problems so that he would be able to devote his efforts on a full-time basis to the business of Shaw Electronics. [4]
*332 Shaw Electronics was not successful and no sales were ever made. In 1967 the corporation was dissolved by proclamation of the appropriate authorities in Florida. At the date of dissolution the corporation had no assets and advances that had been made by petitioner were uncollectible. The major thrust of any attempt to turn Shaw Electronics into an active business had terminated in 1965 as a result of a disagreement between petitioner and Mr. Shaw sometime shortly after the formation of the corporation. During the period Shaw Electronics was in existence petitioner made advances to the corporation in the total amount of $38,889.83. Following the cessation of any active attempt to turn Shaw Electronics, Inc. into a functioning business, petitioner established two other businesses during the years in issue. In 1966, petitioner started a business known as Dolphin's Telephone Answering Service (Dolphin), an unincorporated answering service located in Miami, Florida. The answering service employed 3 to 4 people and was not financially successful. In 1967 petitioner also began an unincorporated business to market weathercaster radios in Miami, Florida under the name of Radio *333 Communications Corporation (RCC). [5] The radios to be marketed were designed to receive the single frequency on which weather information was transmitted on a continuous basis by the Federal government. This endeavor consumed a great amount of petitioner's time. Petitioner experienced a number of problems in his attempt to begin the business and turn it into a profitable one. The radios purchased from the supplier either gave poor performance or did not work at all. Petitioner found that it was difficult to develop a market for the radios because of the limited number of areas in which the weather information was being broadcast at that time. Also, he found that in the areas in which the radio could be used his competitors were either selling at a lower price or were offering a superior quality radio at the price he had to obtain in order to make a profit. During 1967 his employees made trips to New York and Washington, D.C. in an attempt to find someone to sell the radios in the retail market. Petitioner left the law firm in March 1967 in order to pursue this business and his other interests on a full-time basis. Petitioner was involved in an automobile accident sometime *334 after leaving the law firm in March. Petitioner suffered several broken ribs and as a result was incapacitated for several months. During the months of February through April 1967, radios were shipped to petitioner pursuant to contractual arrangements with a single supplier. No radios were received following these dates. In September 1967, petitioner formed a corporation under the laws of the State of Florida by the name of Roscommon and Clare, Inc. to act as the marketing firm of the weathercaster radios. However, this corporation never became active because by this date or shortly following this date, petitioner was of the opinion that he had nothing to market because of the difficulty experienced in attempting to create sales. The venture was not a financially successful one because of the poor quality of the radios and also because of competition and supply costs. *335 RCC was unable to sell a comparable or better performing product at the prevailing retail price. In December 1967, a representative of the Internal Revenue Service contacted the business premises of Dolphin in regard to delinquent Form 941 returns (Employer's Quarterly Federal Tax Returns), which relate to Federal income taxes withheld on employees' wages. One of the employees notified petitioner of the agent's contact and petitioner visited the offices of the Internal Revenue Service in January 1968 to discuss the matter. [6] During petitioner's meeting of January 8, 1969 with a representative of the Internal Revenue Service, petitioner was asked if there were any other taxes owed in addition to the amount of delinquent withholding. Petitioner informed this representative that his individual income tax returns for the years 1964, 1965, 1966 and his estimated tax return for 1967 had not been filed. When questioned about how much was owed, he replied that he could only estimate and no dollar amount was mentioned. On April 1, 1968, petitioner presented the representative of the Internal Revenue Service with a personal *336 check in the amount of $35,000 and stated to him that the check was for the money that he thought he owed for the past years. This was the amount petitioner believed that he owed for income taxes for 1965, 1966 and 1967 although none of the returns for the years in question had been prepared. The Internal Revenue Service applied the amount in full towards petitioner's 1967 estimated tax. On April 8, 1968, petitioner filed his delinquent 1964 individual Federal income tax return which claimed an overpayment of approximately $490. At some later date, when no returns for the years in issue had been filed, [7] petitioner's file was assigned to an Internal Revenue agent for purposes of audit. After the agent made contact with petitioner, the file was referred to the Intelligence Division for investigation.On April 24, 1969, the revenue agent assigned to the case visited the office of petitioner. He was accompanied by a special agent, who informed petitioner that his function was to investigate possible criminal violations of the Internal Revenue Code and that he was a criminal investigator. Petitioner volunteered his records for the years under examination and offered bank statements *337 and brokerage account records for 1965, 1966 and 1967. On April 30, 1969, petitioner was again visited by both the revenue agent and special agent.He provided them with the requested additional information. Further interviews with petitioner by the special agent took place on July 30, 1969 and August 1, 1969. During the interview conducted in August, petitioner provided work sheets of Shaw Electronics and records of his check disbursements. By October 16, 1969, the revenue agent had made tentative determinations of the income of petitioner for the years in issue. The agent explained his determinations to petitioner, who did not disagree except to a few minor items. Also, at this meeting petitioner agreed to provide the expense journal of Dolphin to the agent. On October 27, 1971, petitioner was charged under section 7203 in 3 counts with willful failure to file his Federal income *338 tax returns for 1965, 1966 and 1967. At his arraignment on these charges he plead not guilty to each of the 3 counts. On February 8, 1972, the date his trial was to begin, petitioner changed his plea from not guilty to guilty with respect to Count 3. He changed his prior plea because no further continuances would be granted and it was his belief that his attorneys had done little or nothing to prepare for the case. For these reasons petitioner concluded that the most prudent course was to plead guilty to one count rather than proceeding to trial when he believed he was not prepared to do so. Petitioner believed that this action would allow him additional time to prepare his case because he intended to withdraw his plea at a later date prior to sentencing. Petitioner was adjudged guilty as to Count 3, and a sentencing date of June 23, 1972 was set. Petitioner filed his delinquent individual income tax returns for 1965, 1966 and 1967 several days prior to the scheduled date of sentencing. At the sentencing hearing rescheduled to June 27, 1972, petitioner withdrew his plea of guilty and entered a plea of not guilty. On October 2, 1972, a jury trial on these charges was commenced *339 and at the conclusion of the trial, the jury returned a verdict of not guilty to each count. (United States v. Brennan, docket 71-648-Cr-EC, an unreported case of S.D.Fla.) Over a period of years, which include 1962 through approximately 1972, petitioner made the following advances to various persons of sums of money in addition to those sums furnished Walter Shaw and Shaw Electronics: (1) During the period of approximately 1965-1967, petitioner loaned approximately $60,000 to $65,000 to Mrs. Whitmoore of Tampa, Florida for use by her in Westside Communications, a telephone answering service. In addition, petitioner guaranteed an equipment loan of Westside Communications in the amount of $2,300, which he was required to pay in 1968. Petitioner was introduced to Mrs. Whitmoore by Walter Shaw. (2) During approximately the same period as above, petitioner loaned $40,000 to Gil McDonald Electric, Inc., which was to be repaid $1,000 per month and included interest at 15 percent. The loan had been made to the electrical contractor in order that he might salvage his business which had undergone a serious financial strain due to illness in the family. In addition, during 1969 *340 petitioner guaranteed performance bonds required of the electrical contractor to be eligible to bid on certain jobs. In return, petitioner received a percentage of the contract price. (3) In 1965 petitioner loaned an individual named Owen Norton the sum of $1,000 and guaranteed a note of that individual in the sum of $1,900, which petitioner was later required to pay. This individual was an employee of Shaw Electronics. (4) In 1968 or 1969 petitioner loaned money to an individual so that he could make payment on land he owned which a large department store chain was interested in acquiring. (5) From 1971 to the date of trial petitioner loaned approximately $50,000 to $60,000 to Xeromatic Corporation, a photocopy machine rental business owned by his sister. (6) In 1970 petitioner loaned money to an individual which was to be used to purchase stock. (7) In 1970 petitioner loaned an individual the sum of $25,000 which was to be used for personal uses. (8) In 1962 or 1963 petitioner loaned money to Highsmith and Ezzo, the law firm with which petitioner became associated. The proceeds were to be used in organizing the partnership. (9) In the early 1970's petitioner *341 loaned money to an individual in Rochester, New York, the proceeds of which were to be used in the individual's business. (10) In 1965 petitioner advanced the sum of $2,500 to a South American mining operation. In return he received a 2-1/2 percent interest in the company. (11) In addition petitioner invested sums in Dolphin Answering Service and RCC, businesses operated in proprietorship form, which he has characterized as loans. For the years in issue petitioner included no interest as income on the returns filed. His income tax return for 1964 included $600 in interest income. During the years 1965, 1966 and 1967, petitioner received salary payments from Highsmith and Ezzo in the amounts of $5,300, $7,950 and $1,380, respectively. He received dividend income for these years in the amounts of $3,698.56, $5,683.57 and $3,819.60, respectively, after allowance of the $100 dividend exclusion pursuant to section 116(a). Petitioner had long-term capital gains in the amounts of $19,436.55 in 1965 and $66,138.76 in 1966, after allowance of the 50 percent deduction pursuant to section 1202. In 1967 petitioner had long-term capital gains in the amount of $171,068 after allowance *342 of the 50 percent deduction pursuant to section 1202, exclusive of the advances to Shaw Electronics, which respondent has treated as short-term capital losses from a nonbusiness bad debt. Petitioner utilized an accrual method of accounting to report the income from RCC. On the Schedule C attached to his 1967 return petitioner reported as closing inventory an amount of $18,333. In reaching this amount the accountant who prepared petitioner's returns for him used figures obtained from sales in 1968 on the assumption that all items sold in 1968 were in inventory at the end of 1967. This method was utilized because the employees of RCC retained by petitioner failed to keep business records and therefore there were no inventory records of the business. To determine the closing inventory for 1967, the accountant prepared totals of sales by adding totals on the invoices of RCC in 1968. The accountant then determined an average percentage of profit obtained from the sale of a radio based upon the average excess of the sum received upon sale over the cost of the radio from the manufacturer. To obtain the opening inventory for 1968 on a cost basis the accountant used a profit ratio *343 of approximately 61 percent applied against total sales of $30,873.93. This amount was used as the closing inventory for 1967 on the assumption that the radios which were still in stock at the end of 1967 which were not sold in 1968 had been worthless at the end of 1967. The value at the end of 1968 of the inventory was determined to be zero as no new radios were purchased during the year. At the end of 1968 petitioner actually had a number of cartons of radios with each carton containing 40 radios. In the statutory notice of deficiency, respondent determined an addition to tax for fraud for each of the years and made a number of adjustments to the returns as filed. The only determinations still in dispute are the addition to tax for fraud and the disallowance of loss deductions claimed in 1965 and 1967 for advances made by petitioner which he claimed had become worthless. These adjustments were explained as follows: (d) It is determined that you are not entitled to deduct as a loss, cash advances to two ventures, as you have not substantiated the fact that these advances were actually made, their amount or that they did, in fact, become worthless during the year 1965. Accordingly, *344 your taxable income is increased $5,550.00 in 1965. * * *
(f) The miscellaneous losses shown on your 1967 return in the gross amount of $49,840.00 are now determined to be unallowable as ordinary losses as they have been reclassified and allowed as shown in adjustments (c) and (e) as shown above. Accordingly, taxable income is increased $49,840.00 in 1967. Adjustment (d) above included as one of the two advances mentioned, the advance of $3,050 to Mr. Shaw which petitioner maintains became worthless in 1965. Adjustment (f) above includes $41,939 advanced to Shaw Electronics or Walter Shaw which became uncollectible in 1967. This amount was treated by respondent as a short-term capital loss in 1967. Petitioner at the trial stated that he would not contest the conclusion by respondent that the $3,050 advanced to Walter Shaw which petitioner deducted in 1965 was also included in the $41,939 of advances petitioner claimed to be worthless in 1967. Respondent takes the position that the $3,050 became uncollectible in 1967. The amount of the $49,800 of losses claimed by petitioner in 1967 in excess of the sums advanced to Shaw Electronics or Walter Shaw was treated by respondent *345 as follows: A loan to an individual in the amount of $2,900 was treated as worthless in 1967 and allowed as a short-term capital loss. [8] The remaining $5,000 was reclassified from a miscellaneous deduction and allowed as a travel expense. The issue of the proper year of deduction of the $3,050 advance to Walter Shaw and the proper treatment of the loss from the worthless advances in 1967 to Shaw Electronics, along with the issue of the additions to tax under section 6653(b), are, according to a statement in respondent's brief, all of the items that remain in dispute. Petitioner did not choose to file a brief and the record in many instances is not clear. However, petitioner in his pleadings alleged error in respondent's treatment of the loan of $1,000 *346 to and payment of guarantee of a note of Owen Norton in the amount of $1,900, both of which became uncollectible in 1967. On his return petitioner included this amount in the figure of $49,800 which he claimed as an ordinary deduction in 1967. Respondent has allowed this amount as a short-term capital loss in 1967. Under adjustment (d), respondent determined that two advances totaling $5,500 were not deductible in 1965 due to lack of substantiation. One of these advances was in the amount of $2,500. Respondent's counsel in his opening statement stated that the amount would be allowed as a long-term capital loss as an investment in a gold mine that had become worthless. Petitioner has alleged that such treatment by respondent was in error. Since we do not find concessions on these items by petitioner, we have considered the proper treatment of these claimed deductions as still being in issue. OPINION Issue I.
Petitioner deducted in 1965 as a business bad debt an amount of $3,050 advanced to Walter Shaw which petitioner claims became worthless in that year. Respondent does not dispute that petitioner in fact made the advance, but contends that the amount of the advance *347 did not become uncollectible until 1967.
Section 166(a) allows a deduction for any debt which becomes worthless within the taxable year. Petitioner has offered no evidence to establish that the $3,050 advance to Walter Shaw became worthless in 1965. The only evidence present with respect to the transaction is that a disagreement arose between the petitioner and Walter Shaw during 1965 which caused them to sever their business relationship at a future date. This fact is no indication of the worthlessness of the advance and absent any relevent facts surrounding the circumstances that led petitioner to determine that the debt became worthless in 1965, we hold that the debt became uncollectible in 1967 as determined by respondent. Issue II.
Section 166(d)[9] provides that in the case of a nonbusiness bad debt which becomes worthless, the resulting loss is treated as a short-term capital loss. It is respondent's position that petitioner's advances to Mr. Shaw and Shaw Electronics which became worthless in 1967 were nonbusiness bad debts. Petitioner contends that these advances were business debts and when they became worthless in 1967 he was entitled under section 166(a) to *348 deduct the amounts as ordinary losses. Petitioner takes the position that over the years in issue his activities apart from his law practice, his other work of a legal nature, and his two proprietorships constituted a "trade or business" of making loans or a "trade or business" of promoting. Based upon the facts present in the record before us it is our conclusion that petitioner's activities during the years here in issue did not *349 constitute a trade or business of making loans. Petitioner kept no books or records with respect to the transactions he has characterized as loans.No promissory notes or other evidences of indebtedness were introduced by petitioner and his testimony is that only in some cases did he receive a promissory note. Also there is no indication that he made or caused to be made credit checks prior to making an advance or that any collateral was ever requested. The evidence indicates that in determining whether to make an advance, petitioner was not concerned with the business soundness of making the advance in most instances, only with the fact that the recipient of the funds was someone petitioner knew who had a need for these funds and whose personal situation was such that petitioner wanted to help. The record indicates that petitioner advanced funds only to those that were his friends and relatives or to people that he at least knew prior to entering the transaction. He did not solicit business or advertise. Further, it is clear that no repayment schedule was enforced, at least for the years in issue, as petitioner did not report any interest income for these years. However, he *350 did report interest income in 1964 in the amount of $600 from a loan to Highsmith and Ezzo. Also we note that some of the "loans" activity came from his characterization of sums advanced to his sole proprietorships as loans. We conclude from the evidence as a whole that petitioner's activities with respect to the loans or advances did not constitute a trade or business of making loans in the years here in issue. For basically the same reasons, we have concluded that petitioner was not in the trade or business of making loans, we conclude that he was not in the trade or business of "promoting." There is nothing in this record to indicate that petitioner ever offered his services to others as a promoter. Petitioner received no commissions or broker's fees for any "promotional" activity. The record clearly indicates that all the advances made by petitioner except with respect to the foreign mine company and Shaw Electronics were loans. The record indicates that petitioner's advances to Shaw Electronics were in the nature of capital invested in the corporation. The criteria usually employed in determining whether an advance is risk capital are set forth in Montclair, Inc. v. Commissioner,318 F. 2d 38 (5th Cir. 1963). *351 [10] Shaw Electronics was organized with a minimum capital of $500. It should have been clear to the parties organizing Shaw Electronics that substantial funds in addition to this amount would be required for Shaw Electronics to actually perform any business. Petitioner offered no evidence of any maturity date for the loans to Shaw Electronics, whether interest was to be paid, or whether there was any documentary evidence of a debtor-creditor relationship. Advances of risk capital which become worthless result in a capital loss under section 165(g). On the basis of this record we sustained respondent's treatment of petitioner's loss because of advances he had made becoming worthless in 1967 as capital losses. *352 If as we think the record indicates petitioner has not conceded that the $2,500 loss deduction he claimed in 1965 because of worthlessness of an interest he purchased in a foreign mine was improper, we hold that this amount should properly be treated as a capital loss in 1965. The $5,550 of claimed losses which respondent disallowed in 1965 were composed of this $2,500 and the $3,050 advance to Mr. Shaw previously discussed. Respondent at the trial conceded that petitioner's $2,500 investment in the foreign mine became worthless in 1965 but that the result of this worthlessness was a capital loss. We agree that this treatment is proper under section 165(g). With respect to the $1,000 loan petitioner made to Mr. Norton and the $1,900 note he guaranteed for him, the parties stipulated that: "Petitioner was required to make payment of the $2,900 note he guaranteed for Mr. Norton in 1967." For the reasons discussed with respect to other loans by petitioner, the loss from the $1,000 loan to Mr. Norton is a capital loss. Since the record does not show the use made by Mr. Norton of the proceeds of the loan petitioner guaranteed, petitioner's loss from payment of this loan as guarantor *353 is also a capital loss in 1967. See section 166(f) and section 1.166-8(a), Income Tax Regs.
Issue III.
Section 6653(b)[11] provides that if any part of any underpayment of tax is due to fraud there shall be added to the tax an amount equal to 50 percent of the underpayment. It is incumbent on respondent to allege the basis for the fraud and to establish fraud by clear and convincing evidence. Section 7454(a), Rules 36(b), 39, and 142(b), Tax Court Rules of Practice and Procedure; Beaver v. Commissioner,55 T.C. 85, 92 (1970).As the Court stated in Mitchell v. Commissioner,118 F.2d 308, 310 (5th Cir. 1941), "[the] fraud meant is actual, intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing." *354 The Circuit Court of Appeals for the Fifth Circuit to which an appeal in this case would lie has held that willful failure to file a timely return does not in itself, without more, establish liability for additions to tax for fraud. Jones v. Commissioner,259 F.2d 300 (5th Cir. 1958), revg. 25 T.C. 1100 (1956). Cf. Marsellus v. Commissioner, F.2d (5th Cir. 1977), 77-1 USTC par. 9129, affirming a Memorandum Opinion of this Court. Since respondent's only allegation in his answer of any fraud on the part of petitioner is petitioner's alleged willful failure to file returns, we might be justified in disposing of this case on the basis of the decision of the Court of Appeals in Jones v. Commissioner,supra.However, since in our view the evidence here falls far short of showing fraud, we will discuss the various arguments raised by respondent. It is clear that petitioner conducted his business and personal affairs in a most haphazard and negligent manner for an individual with his education and background. However, negligence, or even gross negligence, is not fraud. Webb v. Commissioner,394 F.2d 366, 377 (5th Cir. 1968). *355 It is respondent's position that the elements of fraud in this case consist essentially of continued failure to file income tax returns over an extended period of time plus receipt of large amounts of income during such period. Respondent argues a lack of cooperation on the part of petitioner with the revenue agent. However, the evidence in this case is clearly to the contrary. There is nothing in the testimony of any of respondent's agents or representatives to show any attempt by petitioner to in any way deceive them and in fact their testimony is that petitioner furnished them all the information they requested and at times records that they had not requested that directly bore on petitioner's tax liability. Their only criticism was that petitioner procrastinated and often did not meet dates previously set. Petitioner obviously had problems during the years here in issue from the lingering effects of an automobile accident in the late 1950's and from another such accident in 1967. He was very negligent in the handling of his business affairs, but the record shown no concealment on his part and in fact complete openness in producing and showing to respondent's agents records *356 of all his transactions. While his absorption with his health problems, his business problems, and his interest in assisting his friends do not excuse his failure to timely file his returns, it does indicate that the reasons for his failure to file were not with any intent to evade tax. This fact is also further shown by petitioner's payment on April 8, 1968 of $35,000 which he estimated to be all the tax he owed for the years here in issue. This $35,000 was about the total amount of tax reported by petitioner on his returns for 1965, 1966 and 1967 as finally filed. The adjustments respondent made to petitioner's returns as filed were primarily technical ones of reclassifying amounts reported. While it is not clear that respondent under his pleadings should be permitted to rely on any argument that the returns as filed were false or fraudulent or in fact that respondent does intend to rely on any such facts, on brief he argues that fraud is indicated by some of the items reported on petitioner's returns. We do not agree with the analysis of respondent. Respondent points out that on Schedule C for RCC of petitioner's 1967 return as filed there is included in cost of goods *357 sold the purchase of weathercaster radios in the amount of $25,097 which petitioner was contesting. The accounts of RCC were kept and its income reported on an accrual method of accounting. Had petitioner not been contesting the $25,097 charge, the amount would have been properly accruable since the radios had been purchased and the charge made by the vendor. However, as petitioner conceded at the trial, the amount was not properly accrued in 1967 because the amount was not paid and a law suit was begun in November 1967 to contest the liability for payment. The accountant who prepared petitioner's return was not informed by petitioner that the $25,097 was not properly accruable. However, the record shows that this error was an oversight on the part of petitioner in failing to explain to the accountant that this amount of purchases shown for the year was a contested liability. The second item which respondent contends supports his determination of fraud is that petitioner in 1965 claimed a loss for worthlessness of a business loan in the amount of $3,050 based upon an advance to Walter Shaw and also include this same loan in the total of $49,800 claimed as a business loss in *358 the 1967 return. Petitioner testified that he was not sure that there was a duplication, but he would not contest respondent's determination. The testimony of petitioner's accountant indicated that he had been apprised of respondent's position prior to trial and therefore checked his work papers, but could not find the duplication. Respondent did not offer to demonstrate how his conclusion of duplication of the claimed deduction was reached. Obviously a concession by petitioner that he will not contest an amount for determination of a deficiency, does not establish the fact for purposes of showing fraud. Respondent argues that the method used to compute the ending inventory of RCC on the Schedule C filed in the 1967 return indicates fraud. If in fact all the radios on hand at the end of 1967 that were not sold in 1968 had been worthless as petitioner contends, there would have been nothing wrong with the method used by petitioner to compute opening inventory for 1968 and the closing inventory for 1967. The record contains no adequate evidence of the value if any of the radios which petitioner had on hand at the end of 1967 which were not sold in 1968. The facts show that *359 petitioner still had these radios at the time of the trial and had not sold them. Again, respondent has failed in his proof of any fraud with respect to this item. Respondent argues that since petitioner kept the books of the law firm with which he was associated and made out its employment tax returns, fraud is indicated by the fact that he withheld tax from his salary in 1965 but did not withhold on the sums received by him from the law firm in 1966 and 1967. However, it is petitioner's uncontradicted testimony that he became a member of the partnership in 1966 entitling him to a profits interest.As such, the amounts received would not be subject to employee withholding, but rather subject to payment of estimated tax during the year. The record shows no course of deception on the part of petitioner. Following the initial contact by representatives of respondent, the record shows petitioner continued to cooperate although time elapsed in complying with requests made by the various representatives of the Internal Revenue Service. [12] However, the evidence shows that all records requested, if in existence, were turned over to respondent's agent. Also, on several occasions, *360 petitioner provided records in addition to specific items requested, in order to present a full disclosure, even at a time when the Intelligence Division of Internal Revenue had become active in the investigation. In short, during the course of the audit or investigation by respondent, petitioner made no attempt to conceal or mislead. Respondent has totally failed to show that petitioner has been "wilfully defiant" or that he has been guilty of bad faith, intentional wrongdoing, and a sinister motive. Powell v. Granquist,252 F.2d 56, 60 (9th Cir. 1958). Respondent has pointed to the fact that in addition to the failure to file the income tax returns there was a substantial amount of income involved in each year, which standing alone, is effective evidence of fraudulent intent, relying on Schwarzkopf v. Commissioner,246 F.2d 731 (3d Cir. 1957), *361 affirming in part and remanding a Memorandum Opinion of this Court. In that case, returns were filed by the taxpayer which failed to report substantial amounts of income in relation to the amount determined by resorting to the net worth method. The Court stated at 734 that "* * *, the consistent failure to report substantial amounts of income over a number of years, standing alone, is effective evidence of fraudulent intent." [13] The fraudulent intent drawn from the fact that returns over a period of time were filed with a substantial understatement of income is that they were intended to mislead respondent into believing that the returns as filed were true and complete returns with the conclusion that such an understatement was the product of a willful act. The statement relied upon by respondent to support his determination of fraud has much less significance in the instant case since the delinquent returns filed by petitioner do not fail to report a substantial amount of income. The failure to file a return, which, if timely filed would have contained a substantial amount of income, does not constitute the same "effective evidence of fraud" as a return filed which misleads the *362 government by attempting to conceal substantial amounts of actual income. See First Trust & Savings Bank v. United States,206 F.2d 97, 100 (8th Cir. 1953). Here the only evidence respondent has produced to support his allegation of fraud is petitioner's long delay in filing his returns. Petitioner explained this long delay in terms of his pressing business problems and his incapacity in 1967 as *363 the result of an automobile accident. The Court was impressed with the openness and truthfulness of petitioner's testimony. While petitioner's explanation is not a showing of reasonable cause for the delay in filing his returns or even a lack of negligence, it does show that the delay was not because of any intent to evade tax. Respondent, in his answer to the petition, alleged as an alternative to the addition to tax under section 6653(b), the additions to tax under sections 6651(a) and 6653(a). [14] We assume from petitioner's statement at the trial that he is not contesting these claimed additions to tax. However, if our inference is wrong, we hold that respondent has established that these additions are proper. *364 The evidence clearly supports the addition to tax under section 6651(a) as the returns were not filed until 1972, petitioner has shown no reasonable cause within the meaning of section 6651(a) for the failure to file timely returns, and respondent has shown that the delay until 1972 to file these returns was not due to reasonable cause. Petitioner was well aware of the requirement to file a timely return and the fact that he was too busy with other matters to prepare his own returns is not sufficient cause. See Dustin v. Commissioner,53 T.C. 491, 507 (1969), affd. 467 F.2d 47 (9th Cir. 1972). Also petitioner's problems because of the automobile accident do not excuse the unreasonable delay of petitioner in filing these returns. The late filing of the 1965, 1966 and 1967 income tax returns was due to willful neglect on the part of petitioner. With respect to the addition to tax under section 6653(a), the record clearly establishes that petitioner was negligent in complying with his duty to file timely income tax returns for the years in issue. [15] This negligence alone has been held to justify both the addition to tax under section 6651(a) and *365 section 6653(a). Robinson's Dairy, Inc. v. Commissioner,35 T.C. 601, 608-609 (1961), affd. 302 F.2d 42 (10th Cir. 1962). However, the record discloses negligence and disregard of rules and regulations by petitioner with respect to maintaining proper records of some of his business activities. The affirmative evidence in this record establishes that petitioner is liable for the addition to tax under section 6653(a). Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
2. At this time petitioner began taking courses towards a Master's Degree in Taxation from the University of Miami School of Law. He completed only one semester's work.↩
3. Subsequent to this meeting petitioner contacted an individual that he knew in Tampa, Fla. who operated a telephone answering service. He directed her to the proper authorities in Washington to aid her in obtaining the license for her area. Mr. Brennan flew to Hawaii on his own behalf in an attempt to obtain background information in order to meet the requirements to obtain a license for that area. The record does not disclose whether he was successful in his efforts.↩
4. On petitioner's income tax return for 1965, he deducted the amount of the advance as an ordinary loss with the following explanation: Taxpayer in the course of his business as a promoter incurred the following losses during the year 1965: (1) Cash advance to an inventor to induce his services in connection with a telephone communication venture. This amount was not recovered and became a loss in 1965.↩
5. Petitioner intended to incorporate the business and submitted incorporation papers to the proper authorities. However, he was notified by the Secretary of State of Florida that the name could not be accepted because there was another corporation organized under Florida law with the same or a similar name.↩
6. The delinquent returns were filed on January 29, 1968.↩
7. Petitioner filed an estimated tax return for 1968. On April 15, 1969, he mailed a check in the amount of $60,000 even though no individual income tax return was filed for the year and such return has not been filed, nor have any returns for years subsequent to the years in issue been filed.↩
8. Although the statutory notice of deficiency treated this item as a loan to an individual and the parties so stipulated at the trial, petitioner alleged in his petition that this amount was comprised of a loan in the amount of $1,000 and a payment as guarantor of a loan of the same individual in the amount of $1,900. The record established that there was a loan of $1,000 and a payment as guarantor of the $1,900 amount.↩
9. SEC. 166(d) Nonbusiness Debts.-- (1) General rule.--In the case of a taxpayer other than a corporation-- (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness debt defined.--For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than-- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩
10. The criteria found in Montclair, Inc. v. Commissioner,318 F.2d 38, 40 (5th Cir. 1963), to be the relevant inquiry are: There are at least eleven separate determining factors generally used by the courts in determining whether amounts advanced to a corporation constitute equity capital or indebtedness. They are (1) the names given to the certificates evidencing the indebtedness; (2) the presence or absence of a maturity date; (3) the source of the payments; (4) the right to enforce the payment of principal and interest; (5) participation in management; (6) a status equal to or inferior to that of regular corporate creditors; (7) the intent of the parties; (8) "thin" or adequate capitalization; (9) identity of interest between creditor and stockholder; (10) payment of interest only out of "dividend" money; (11) the ability of the corporation to obtain loans from outside lending institutions. * * *↩
11. SEC. 6653(b)↩ Fraud.--If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount determined under subsection (a). In the case of a joint return under section 6013, this subsection shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such spouse.
12. Several agents of Internal Revenue testified to the effect that Mr. Brennan gave all outward appearances of cooperation but that he was very slow in complying with requests. However, these agents offered no specific instances of petitioner's supposed dilatory behavior with respect to the years in issue.↩
13. Respondent also cites us to Morrof v. Commissioner,T.C. Memo. 1967-201 [26 TCM 985, 995], which contains a similar statement relying on Schwarzkopf v. Commissioner,246 F.2d 731 (3d Cir. 1957); Holland v. United States,348 U.S. 121 (1948); and Kurnick v. Commissioner,232 F.2d 678 (6th Cir. 1956). In Morrof,↩ petitioner did not file timely returns for some of the years in issue and the delinquent returns filed contained a pattern of substantial omissions from income. As such, the case is clearly distinguishable on its facts from the case before us. The cases relied upon also were based on the fact that the returns filed by the taxpayers involved contained similar substantial omissions.
14. For the year in issue, sec. 6651 in pertinent part provided as follows: SEC. 6651. FAILURE TO FILE TAX RETURN. (a) Addition to the Tax.--In case of failure to file any return required under authority of subchapter A of chapter 61 (other than part III thereof), of subchapter A of chapter 51 (relating to distilled spirits, wines, and beer), or of subchapter A of chapter 52 (relating to tobacco, cigars, cigarettes, and cigarette papers and tubes), or of subchapter A of chapter 53 (relating to machine guns and certain other firearms), on the date prescribed therefor (determined with regard to any extension of time for filing), unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate. SEC. 6653. FAILURE TO PAY TAX. (a) Negligence or Intentional Disregard of Rules and Regulations With Respect to Income or Gift Taxes.--If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A or by chapter 12 of subtitle B (relating to income taxes and gift taxes) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment.↩
15. We note that, in any event, petitioner, in his reply to respondent's answer, admitted that he was negligent in failing to file timely returns for the years in issue.↩